Marcia R. LIEBERMAN, Plaintiff,

v.

Edward V. GANT, Individually and as Acting President and Provost of the University of Connecticut, William C. Orr, Individually and as Associate Provost of the University of Connecticut, Kenneth G. Wilson, Individually and as Vice-President (Academic Programs) of the University of Connecticut, Robert W. Lougee, Individually and as Dean of the College of Liberal Arts and Sciences of the University of Connecticut, William T. Moynihan, Individually and as Head of the Department of English of the University of Connecticut, Charles A. Owen, Jr., Individually and as Chairman, Elected Tenure and Promotion Committee, Department of English, of the University of Connecticut, and Gordon W. Tasker, Merlin D. Bishop, Carl W. Nielsen, Joseph R. McCormick, Betty J. Jones, William DeHomer Waller, John M. Lupton, Louise Kronholm, Norma Jorgensen, Robert F. Taylor, Walter B. Kozloski, and Charles Stroh, Individually and as members of the Board of Trustees of the University of Connecticut, Defendants.

Civ. No. 15736.

United States District Court,
D. Connecticut.

Aug. 2, 1979.

850

Louis M. Winer, Peter A. Kelly, J. Michael Sulzbach, Winer, Kelly & Sulzbach, New Haven, Conn., for plaintiff.

Thomas F. Parker, Gross, Hyde & Williams, Hartford, Conn., for Edward V. Gant, William C. Orr, Kenneth G. Wilson and Robert W. Lougee, Individually.

Edward J. Daly, Jr., Silvester & Daly, Hartford, Conn., for William T. Moynihan and Charles A. Owen, Jr.

John R. Fitzgerald, Howard, Kohn, Sprague & Fitzgerald, Hartford, Conn., for Carl W. Nielsen.

Bourke G. Spellacy, Thomas J. Shortell, Charles F. Corcoran, III, James T. Graham, Updike, Kelly & Spellacy, Hartford, Conn., for Joseph R. McCormick.

Robert C. Danaher, R. Cornelius Danaher, Jr., Danaher, Lewis & Tamoney, Hartford, Conn., for John M. Lupton.

James J. Kennelly, Hartford, Conn., for Louise Kronholm.

Israel Rosenzweig, Rosenzweig & Fagan, New Britain, Conn., for Norma Jorgensen.

F. Timothy McNamara, Hartford, Conn., for Robert F. Taylor.

John F. Scully, Patrick J. Flaherty, Cooney, Scully & Dowling, Hartford, Conn., for Walter B. Kozloski & Charles Stroh, Individually.

John F. McKenna, Asst. Atty. Gen., Hartford, Conn., John G. Hill, Jr., Asst. Atty. Gen., Storrs, Conn., Carl R. Ajello, Atty. Gen., Hartford, Conn., for all defendants as officials or employees of the State of Connecticut and for defendants Gordon W. Tasker, Merlin D. Bishop, Betty J. Jones and William DeHomer Waller, Individually.

Bernard F. McGovern, Jr., Sidney D. Giber, David J. Della-Bitta, Asst. Attys. Gen., Carl R. Ajello, Atty. Gen., Hartford, Conn., for all defendants as officials or employees of the State of Connecticut and for defendants, Gordon W. Tasker, Merlin D. Bishop, Betty J. Jones and William DeHomer Waller, Individually.

## MEMORANDUM OF DECISION

CLARIE, Chief Judge.

The plaintiff Marcia R. Lieberman was denied tenure at the University of Connecticut after teaching in the University's English department in a nontenured status for a probationary period of six years. She instituted this action against the University's Board of Trustees, several of its officers and members of its English department, alleging that the decision not to promote her to a tenured position was made in retaliation for her political activities on behalf of women, was motivated by sexual bias, and was carried out in contravention of the procedures prescribed by the University for evaluating faculty members.

The case was tried to the Court without a jury. Trial commenced on April 20, 1976 and consumed 52 days of court time, finally concluding on May 26, 1978. The case was suspended several times because of the Court's criminal business, but the longest delay was due to the protracted illness of the plaintiff's attorney.[1]

After reviewing all of the evidence, including a trial transcript of nearly 10,000 pages and almost 400 exhibits, the Court

---

1. The ruling on the merits of this case was further delayed, while the Court awaited counsels' filing of proposed findings of fact and conclusions of law. At the conclusion of trial it was agreed that briefs would be filed no later than July 31, 1978. The Court thereafter granted numerous requests for extension of time, which were sought jointly by both sides. On February 22, 1979 the Court approved a final extension until March 5, 1979. The defendants' brief was duly filed on that date. The plaintiff's attorney made several representations to the District Court Clerk's Office as to when his proposed findings and conclusions would be filed, but each of the dates he mentioned passed without his filing a brief. The Court finally informed the plaintiff's attorney that any brief filed after July 13, 1979 would not be considered. As of the present date no brief has been filed on behalf of the plaintiff. Neither has any justification for failure to submit a brief been offered. The Court's ability to reach a decision in this case was not compromised by the plaintiff's failure to file a brief, inasmuch as the factual record was developed at length and the legal issues were thoroughly briefed by the defendants.

finds that the plaintiff has failed to meet her burden of proof, as to any of the five counts of her complaint. The evidence discloses that the decision to refuse tenure to the plaintiff was made in good faith and in conformance with the appropriate procedures, and was not infected with sexual or political bias. Accordingly, judgment shall enter for all defendants.

### Statement of Facts

The plaintiff Marcia Lieberman was first hired by William T. Moynihan, head of the English department, as a part time lecturer to teach one course in the fall of 1967. A major consideration in the hiring of Marcia Lieberman was the University's interest in her husband, Philip Lieberman, a recognized linquist of considerable professional stature. The University was forming a new department of Linguistics at the time and those who were trying to attract Philip Lieberman felt that finding a job for Mrs. Lieberman would be helpful in enticing Philip to come to the University. (Tr. 5506–07, 5241). Mrs. Lieberman was not hired in the normal manner; in fact, Professor Charles A. Owen, Jr., who was chairman of the English department's joint committee at the time, testified that the job as lecturer was created for her. (Tr. 6861).

In the normal case a candidate would forward his or her dossier to the appointments committee of the English department. The committee would evaluate the dossiers and set up interviews with the top 40 prospects. The committee would then make its hiring recommendations based upon its assessment of the candidates' merit. (Tr. 7068). Mrs. Lieberman bypassed this procedure, and dealt directly with the head of the department, who was encouraged to find a job for her by Kenneth Wilson, who at that time was Dean of the College of Liberal Arts and Sciences. (Tr. 6945, 2392–94.) Moynihan testified that if

Mrs. Lieberman's application had proceeded in the normal course, she probably would not have survived the initial screening process, and that if she had she would have ranked near the bottom of the 40 candidates who were selected for an interview. (Tr. 6949–50, 7069–70).

During Mrs. Lieberman's first semester at the University a vacancy in a full time position in the English department occurred when Peggy Knapp resigned her position effective as of the end of the semester. (Tr. 1811). Moynihan then appointed Mrs. Lieberman to the rank of assistant professor to fill that vacancy. (DX–DDD).[2] Her letter of appointment made clear that the position was temporary and that her appointment would extend only until July 31, 1968. (PX–91, 92). Moynihan again appointed Marcia Lieberman to a temporary one year position for the following academic year, said appointment to expire on September 15, 1969. (PX–94).

During the fall of 1968, i. e., her second temporary year at the University, the plaintiff sought a tenure track appointment from the English department's executive committee.[3] That group advised her to submit her dossier to the appointments committee, so that her application could be reviewed along with other candidates for permanent positions. (DX–CCC). Upon reviewing Mrs. Lieberman's credentials the appointments committee informed the department head, Moynihan, that her credentials were not of sufficient quality to earn her an interview. (Tr. 7032). Thereafter the executive committee considered Mrs. Lieberman's request for a permanent appointment. Three members of the executive committee who were familiar with the subject matter of her dissertation read it, and all three found it unsatisfactory. (Tr. 6267). Professor Clark called it "terrible," and Professor Sonstroem stated that if he had been her dissertation advisor, he would

---

**2.** "DX" denotes defendants' exhibit, and plaintiff's exhibits are denominated "PX."

**3.** The principal difference between a tenure track and a temporary appointment is that a faculty member on the tenure track is entitled

to consideration for reappointment by several University committees, whereas a temporary appointee receives no such procedural protection. These procedures will be discussed in detail below.

not have accepted it. (Tr. 7034, 1403). The executive committee unanimously recommended that she not be given a tenure track appointment. (Tr. 6442).

Moynihan took a leave of absence from the University in the second semester of 1968–1969 and Charles Owen served as acting head of the English department. Prior to leaving Moynihan informed Owen of Mrs. Lieberman's interest in another temporary position for the following year, if she could not get a tenure track appointment, and asked him to consider her if a vacancy occurred. (Tr. 7087). Later Owen did offer Mrs. Lieberman a temporary appointment; the letter of appointment specified a one year period, ending September 15, 1970. (PX–95).

At Moynihan's request the English department's Promotion and Tenure committee considered the plaintiff's request for a tenure track appointment in the fall of 1969. (Tr. 7053). The promotion and tenure committee, regarding her credentials as inferior to other members of the permanent junior faculty, voted against offering her a permanent position. (DX–TT p. 3). The executive committee, in light of this report and in view of the likelihood of attracting more qualified candidates, voted in December not to offer her a tenure track appointment. (DX–TT p. 3). In January of 1970 the executive committee again considered Mrs. Lieberman for a tenure track position and decided to pursue all candidates whose records were clearly superior to hers. (DX–TT p. 3.). A list of potential candidates was drawn up and Mrs. Lieberman was rated 13 out of 15. Nevertheless, when an English professor resigned his position, Moynihan recommended that Mrs. Lieberman be appointed to the tenure track position, after the 12 people who ranked above her on the hiring list were approached and refused the

position. (Tr. 1411–12, 7071). Moynihan made this recommendation notwithstanding the objections of the executive committee, because he wanted Marcia Lieberman to have a chance to prove herself. (Tr. 7073). Her letter of appointment specifies that her appointment was to run nine months, beginning September 10, 1970. (PX–98).

Article X–K–3–d of the University's Laws and By-Laws provides for a probationary period of 7 years before a professor must be considered for tenure. (PX-1 p. 29). Section K–3–e of that Article specifies that the candidate for tenure must be notified of the decision on tenure prior to the conclusion of the faculty member's sixth year of service. (PX–1 p. 30). Thus a probationary faculty member in effect has six years in which to prove himself worthy of a lifetime appointment; for if he is appointed to a seventh year, he gets tenure automatically. (Tr. 7096).

At the time of her initial appointment to the tenure track, Marcia Lieberman requested that her first three years of teaching experience not be counted towards the probationary period; she wished to have an additional six years in which to prove herself. (TX–OOO, Tr. 7083–85). This request was forwarded to William Orr, Associate Provost of the University, who ruled that under Article X–K–3–d her previous two and one-half years of full time experience would have to be counted towards her probationary period. However, the first semester during which she was only serving as a part time lecturer would not be calculated in the probationary period.[4] Consequently, her probationary period would be four and one-half years from the date of her appointment to the tenure track; i. e., the probationary period would run to January, 1975. However, since all final tenure decisions are made in the spring by the

4. The plain language of the By-Laws supports this conclusion:

"Beginning with appointment to the rank of full-time instructor or equivalent or a higher rank, the probationary period shall not exceed seven years . . . ." (PX–1 p. 29). Moreover the interpretation given to a university's regulations by those who deal with them

on a daily basis is entitled to considerable weight. *Jablon v. Trustees of California State Colleges*, 482 F.2d 997, 999 (9th Cir. 1973), *cert. den.* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); *Adamian v. Jacobsen*, 523 F.2d 929, 932 (9th Cir. 1975).

University's Board of Trustees, her final probationary year would be 1973–1974. (DX–PPP). Since the Laws and By-Laws mandate that a faculty member be informed of the tenure decision at least 12 months in advance, the tenure decision for Mrs. Lieberman had to be made in the academic year 1972–1973. The plaintiff's June 10, 1970 letter to Moynihan demonstrates that she understood at the outset that her probationary period would be four and one-half years and that the final decision would be made in 1972–1973. (DX–QQQ, Tr. 7877).

Mrs. Lieberman began teaching on the tenure track in September, 1970. Pursuant to the procedures which had been adopted for making recommendations to the Board of Trustees on reappointment of tenure track faculty members, she was reviewed first by the English department's five member promotion and tenure committee. She was then reviewed by a group known as the "joint committee," which is comprised of members of the promotion and tenure committee plus the members of the executive committee. Both groups recommended her reappointment. Department head Moynihan concurred and Mrs. Lieberman was reappointed by the Board of Trustees for another probationary year. The letter notifying the plaintiff of the Trustees' action specifies that her reappointment is to run for a year commencing September 10, 1971. (PX–99).

In the spring of 1971 the five member promotion and tenure committee met with the plaintiff to give her direction and to advise her as to how she could overcome her shortcomings, so that she might ultimately merit tenure. Mrs. Lieberman was told at that time that she should attempt to improve her teaching and to concentrate her scholarship in a single discipline instead of spreading it over two or three separate areas. (Tr. 7121–22).

In the fall of the academic year 1971–1972, when Mrs. Lieberman was commencing her fifth probationary year at the University, she was again recommended for reappointment by the joint committee and

Moynihan. (PX–28). Robert Lougee, dean of the College of Liberal Arts and Sciences, concurred in this recommendation, but wrote a warning letter to Mrs. Lieberman on May 5, 1972, indicating that her scholarship to date was inadequate and that she should attempt to remedy this before she came up for tenure. (PX–45). Her letter of reappointment stated that it would be effective for the year commencing September 1, 1972. (PX–101).

Mrs. Lieberman was also warned by the promotion and tenure committee about the weaknesses in her scholarship in a meeting in the spring of 1972. She disagreed with some of the comments made, but she did not take the opportunity to state her objections to the committee. (Tr. 2534–37). The general tenor of the remarks made by the committee was that her scholarship did not measure up to the standards required for tenure. (Tr. 1947). The plaintiff was upset with the remarks made by the members of the promotion and tenure committee. She went to see Moynihan and told him that she felt that she had written a sufficient number of scholarly articles. Moynihan responded that it was quality and not quantity which was lacking in her work. When she asked what she must do to get tenure, Moynihan answered that she must write one essay that would convince the committee about the quality of her mind. She rejoined, "Many of my colleagues will never admire my work," intimating that certain members of the English department were prejudiced against her. She also questioned their competence to evaluate her essays. (Tr. 7196).

The academic year 1972–1973 was the year when the tenure decision on Mrs. Lieberman had to be made. The same procedures are followed in tenure decisions as in the case of reappointment; however, the candidate is given much closer scrutiny when up for tenure. The ultimate decision is made by the Board of Trustees. There are three levels of review, before a final recommendation is made to the Board of Trustees, namely, the department, the dean's level, and the central administration.

In the English department there is a two-tiered review. A preliminary recommendation is made by the promotion and tenure committee, a five member panel elected by the members of the English department from among the tenured faculty. After the five member promotion and tenure committee has made its preliminary assessment, that committee meets in conjunction with the executive committee, which is comprised of four tenured faculty members elected by the department and one non-tenured member appointed by the head of the department. This group of ten comprises the promotion and tenure committee of the whole, commonly called the "joint committee." The non-tenured member of the executive committee normally participates in the joint committee deliberations but does not vote. The joint committee deliberates and votes on the candidate's merit. This vote is then reported to a meeting of the tenured faculty of the English department. The tenured faculty, though powerless to change the joint committee's decision, can either approve the joint committee's action or recommend reconsideration. If the tenured faculty votes for reconsideration, the joint committee deliberates again and then reports its decision to the department head. The latter, who is not bound by either the promotion and tenure committee's recommendation or that of the joint committee, then makes his own recommendation and forwards it to the dean.

At the dean's level, the case for tenure is initially referred to the dean's advisory council, a panel of eight faculty members appointed by the dean. A member of the dean's advisory council who is a member of the same department as the candidate who is up for tenure participates in the deliberations, but does not vote. After the dean's advisory council makes its recommendation the dean, who is not bound by that decision, makes his own recommendation and reports it to the central administration.

At the central administration level the President, the Provost, the Associate Provost and the Vice-President for Academic Affairs jointly decide upon what recommendation they shall make to the Board of Trustees. The results of all of the committee votes as well as the recommendations of the department head and the dean are contained in a promotion and tenure file, which originates with the department head and is presented by the President, along with his own recommendation, to the Board of Trustees. The final decision is then made by the Board of Trustees.

Mrs. Lieberman's tenure case was a close one at every level. She was evaluated for promotion from assistant professor to associate professor at the same time that she was considered for tenure. The preliminary vote of the promotion and tenure committee was 5–0 in favor of tenure and 3–2 against promotion. (Tr. 7255, 7263). The joint committee then convened and voted 5–4 in favor of tenure and 7–2 against promotion. (Tr. 7286). Under the rules of the English department a two-thirds majority was necessary in order for the joint committee to make a favorable recommendation on tenure. Consequently, the 5–4 vote meant that the joint committee had failed to endorse Mrs. Lieberman for tenure. (Tr. 7286). On November 27, 1972 the tenured faculty voted 15–15 on the question of whether the joint committee's action should be accepted. Moynihan, as head of the department, voted for reconsideration, thus breaking the tie and sending the case back to the joint committee. (Tr. 7304).

The joint committee reconvened and voted again. This time she lost a vote; the tally was 5–4 against tenure and remained 7–2 against promotion. (Tr. 7309). The joint committee met again to permit the plaintiff a chance to appear before the committee. Mrs. Lieberman came to a meeting on December 8, 1972, made a statement, and submitted letters from scholars outside the University in support of her case for tenure. (Tr. 2223–35). The joint committee then deliberated further and took another vote. This time the vote was the same as the previous one; that is, 5–4 against tenure and 7–2 against promotion. (Tr. 7310–12). On December 26, 1972 Moynihan made his own recommendation against tenure and forwarded the file to the dean's office.

Only six of the eight members of the dean's advisory counsel voted on Mrs. Lieberman. One member of the advisory council, Professor Rosen, was a member of the English department and therefore did not vote on candidates from his own department. It is probable that if he had voted in the advisory council, Rosen's vote would have been against granting tenure. He had voted against reconsideration when the joint committee's recommendation was submitted to the meeting of the tenured faculty. (Tr. 6488). William Masterson abstained because he felt incapable of voting, since he was not present when the plaintiff appeared before the advisory council. (Tr. 4625). With those two not voting the dean's advisory council divided evenly, 3–3, on tenure and was unanimous against promotion. (Tr. 928–955). Marcia Lieberman was permitted an opportunity to appear before and speak to the advisory council prior to the vote. Joan Hall also spoke on her behalf. (Tr. 2234, 6490–91). Robert Lougee, Dean of the College of Liberal Arts and Sciences, recommended a terminal appointment and forwarded Marcia Lieberman's file to the central administration. Edward V. Gant, Acting President and Provost, then reviewed the file along with Associate Provost William C. Orr and Vice-President for Academic Affairs Kenneth G. Wilson. Marcia Lieberman was permitted an opportunity on March 15, 1973 to meet with and present her case to these three individuals. (Tr. 8116–17). A decision was

made by them to recommend a terminal appointment. At the Board of Trustees' regularly scheduled meeting on March 24, 1972, the Board, acting on Gant's recommendation, decided to award Marcia Lieberman a terminal appointment for the year 1973–1974.

Mrs. Lieberman taught at the University during the academic year 1973–1974, leaving there in June, 1974. (Tr. 2349). In September of that year she was appointed a visiting scholar at Wesleyan University, a post which entitled her to use of the library and office but carried no teaching duties or compensation. Although she applied for numerous teaching positions at both the college and preparatory school level throughout New York and New England, the only teaching job she was able to procure after leaving the University of Connecticut was a one year appointment to teach one evening course at the University of Rhode Island during the academic year 1975–1976. (Tr. 2350–51).

### Jurisdiction

■ The Court has subject matter jurisdiction over the counts of the complaint which charge transgressions of 42 U.S.C. §§ 1983, 1985 and 1986, by virtue of 28 U.S.C. § 1343. Jurisdiction over the claim of sex discrimination is expressly provided for in 42 U.S.C. § 2000e–5.[5] The plaintiff's state law claims are within the pendent jurisdiction of the Court.

---

**5.** The plaintiff satisfied the prerequisites to instituting a Title VII action by filing a charge with the Connecticut Commission on Human Rights and Opportunities on June 5, 1973 (PX–147) and a charge with the federal Equal Employment Opportunity Commission on June 9, 1973 (PX–148). The latter agency issued a right to sue letter on February 25, 1974 (PX–149).

The defendants argue that the plaintiff should have presented her claims to the grievance committee, according to the procedures outlined in Article X–K–6, 7 and 17 of the University's Laws and By-Laws. (PX–1). The plaintiff initiated a grievance in the spring of 1973, but later informed the committee that she no longer wished to pursue the grievance. (Tr. 7519–20, 8161). Assuming without deciding that this circumstance would have caused the

Court to withhold its jurisdiction, had the issue been raised at an early stage of the litigation, *see Myers v. Bethlehem Steel Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the defendants waived this defect by not raising it until the trial was nearly completed. Chief Justice Burger has succinctly stated the rationale behind the doctrine of exhaustion of administrative remedies: "Exhaustion is simply one aspect of allocation of overtaxed judicial resources." *Moore v. East Cleveland,* 431 U.S. 494, 524, 97 S.Ct. 1932, 1948, 52 L.Ed.2d 531 (1977) (Burger, C. J., dissenting). This purpose would hardly be served by invoking the doctrine after the bulk of the judicial resources which the plaintiff's case required had already been expended.

*Discussion of the Law*

A. *Procedural Due Process*

 To be entitled to the procedural protections of the Fourteenth Amendment the plaintiff must prove that the University's decision not to grant her tenure deprived her of either a liberty or a property interest. *Board of Curators, University of Missouri v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). In other words, "to determine [which] due process requirements apply in the first place, we must look not to the 'weight' [of the competing interests involved] but to the *nature* of the interest at stake." *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) (emphasis in original).

 A public employee who is dismissed from his job can claim a liberty interest only if the reasons given for his termination are false, defamatory and made public by his employer. *Codd v. Velger,* 429 U.S. 624, 626–28, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The idea is to permit the public employee a hearing so that he can clear his name of any false charges. *Ibid.* However, allegations of inadequate job performance, as opposed to charges of dishonesty or immorality, are not sufficiently stigmatizing to implicate a liberty interest. *Board of Regents v. Roth, supra,* 408 U.S. at 572–74, 92 S.Ct. 2701; *Pordum v. Board of Regents,* 491 F.2d 1281, 1283 (2d Cir. 1974), *cert. den.* 419 U.S. 843, 95 S.Ct. 74, 42 L.Ed.2d 71 (1974). Since the only reasons offered by any of the defendants for the decision to give Mrs. Lieberman a terminal appointment were the inadequacies of her teaching and scholarship, she can make no claim that the terminal appointment infringed any liberty interest. Moreover, these reasons were never communicated to anyone except those individuals and committees who had to pass on her case. Consequently, even if those reasons were stigmatizing, no liberty interest would be implicated since the reasons for her non-retention were never publicized

by the defendants. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).[6]

 To have a property interest in a tenured position at the University, Mrs. Lieberman must have "more than a unilateral expectation of it;" she must be able to prove "a legitimate claim of entitlement to it." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. In the latter case Roth had been appointed to teach at a state university for a year. During that year he was informed that he would not be reappointed. Roth instituted a civil action claiming that the school's failure to provide him with notice and a hearing on the reasons for his non-retention violated his right to due process. The Supreme Court, recognizing that property interests are created by state law rather than by the Constitution, held that the scope of Roth's claim to renewal was defined by the term of his appointment. *Id.* at 577–78, 92 S.Ct. 2701. Those terms protected his interest in his employment up to the final date of his appointment; however, since his appointment specified the date on which his employment would terminate and did not guarantee his reappointment, the college was not required by the Constitution to give him a hearing prior to reaching its decision on tenure. *Id.* at 578, 92 S.Ct. 2701.

 The position of the plaintiff in the present case is virtually identical to Roth's. The term of her appointment was expressly limited to one year:

"In conformity with the University procedure in regard to the appointment and reappointment of staff members on the *annual appointment basis,* the Board of Trustees at a recent meeting voted to approve your reappointment as Assistant Professor of English, *for the year* beginning September 1, 1972." (PX–101) (emphasis supplied).

---

6. The minutes of the meeting of the Board of Trustees, which is a public record, merely records the fact that Mrs. Lieberman was given a terminal appointment; no reasons were given for that decision. (DX–D).

The University procedures to which the letter of appointment refers specify that it is only faculty members with tenure who cannot be terminated, except for cause. (PX–1, Art. X–K–3–d, pp. 29–30). The Second Circuit has read *Roth* as holding that an untenured college teacher does not have a sufficient property interest in his job to warrant the invocation of the due process clause. *Pordum v. Board of Regents, supra,* 491 F.2d at 1283; *Lombard v. Board of Education,* 502 F.2d 631, 637 (2d Cir. 1974) *cert. den.* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). As was stated in a case which is factually similar to the one at bar:

> "The *Roth* decision . . . laid to rest the legal question of procedural due process as it applies to the non-reappointment of non-tenured professors in that it holds that procedural due process does not require a statement of reasons and a hearing." *Watts v. Board of Curators, University of Missouri,* 363 F.Supp. 883, 888 (W.D.Mo.1973), *aff'd* 495 F.2d 384 (8th Cir. 1974); *see also Cotten v. Board of Regents,* 395 F.Supp. 388, 393 (S.D.Ga. 1974), *aff'd* 515 F.2d 1098 (5th Cir. 1975).

As an untenured teacher, Marcia Lieberman, like Roth, had no legitimate claim of entitlement to continued employment. Her appointment was limited to the academic year 1972–1973, and she had no property interest in her job once that term was concluded.[7]

The plaintiff, relying on cases such as *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)[8] and *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), contends that even if the Four-teenth Amendment did not compel the University to afford her procedural due process in the first instance, once the University had adopted certain procedures for determining which of its junior faculty would be awarded tenure, those procedures had to be followed. Thus the argument is that even if she did not have a property interest in the job itself, she did have a property interest in the procedures for determining whether she would receive tenure. A majority of the Supreme Court has declined to adopt this anomalous reasoning:

> "Respondent also contends that petitioners failed to follow their own rules respecting evaluation of medical students and that this failure amounted to a constitutional violation under *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 968, 1 L.Ed.2d 1403 (1957). We disagree with both respondent's factual and legal contentions. [The Court then noted that the record disclosed that the appropriate procedures had in fact been followed]. As for the legal conclusion that respondent draws, both *Service* and *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), upon which *Service* relied, enunciate principles of federal administrative law rather than of constitutional law binding upon the States." *Board of Curators, University of Missouri v. Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956 (1978).

Nonetheless, because the statement in *Horowitz* is technically dictum[9] and in order to present a complete record for appellate purposes, the Court will address the ques-

---

**7.** The plaintiff has made no claim for a *de facto* tenure system, which would give rise to a property interest in continued employment. *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Even if such a claim had been made, the fact that the University has a formal tenure system "weighs heavily against a finding of unwritten rules for the governing of employment rights." *Cotten v. Board of Regents, supra,* 395 F.Supp. at 393. *See also Watts v. Board of Curators, supra,* 363 F.Supp. at 888.

**8.** In that case the Supreme Court held that while the Secretary of State was under no obli-gation to provide any procedural protections when terminating foreign service officers, once he adopted regulations setting up procedures, he was bound by those regulations. 354 U.S. at 388, 77 S.Ct. 1152.

**9.** Justice Marshall, concurring and dissenting in *Horowitz,* labeled footnote 8 "nothing more than confusing dictum," and stated that the question of whether the Constitution requires a State to follow its own previously established procedures is still an open one. 435 U.S. at 107–08 n. 22, 98 S.Ct. 948.

tion of whether the University followed its own procedures in this case.[10]

■ The major flaw which is claimed to have poisoned the procedures is Moynihan's decision to obtain evaluations of Mrs. Lieberman's scholarship from sources outside the University. Faced with what he considered to be a difficult tenure decision, Moynihan asked Donald C. Freeman, professor of Linguistics at the University of Massachusetts, and Isabel MacCaffrey, professor of Literature at Harvard University, to read and appraise certain articles which the plaintiff had written. Freeman reacted negatively to Mrs. Lieberman's scholarship, concluding: "I would think more highly of these essays if I saw in them real originality and interesting ideas, however poorly argued. But frankly, I don't." (PX–24). MacCaffrey was equally blunt: "The quality of mind displayed in these papers seems to me mediocre though not wholly negligible." (PX–25).

Moynihan only wanted these opinions for his own guidance, and he did not intend to show them to anyone else. (Tr. 7360). The substance of the letters was not disclosed either to the promotion and tenure committee or to the joint committee. However, when the joint committee's recommendation was brought before the meeting of the tenured faulty, some members of the faculty demanded that the letters be read. Moynihan then read the MacCaffrey letter, and there was no further request that he also read the Freeman letter. The latter's evaluation was merely mentioned and described as being "mixed to negative."

While it is true that outside evaluations were not sought in the normal tenure case (Tr. 1591), there is no question that Moynihan was justified in obtaining the outside opinions.[11] The Provost's Rules, which governed the procedures to be followed in reaching the tenure decision, expressly state: "The department head . . . may seek the opinions of colleagues in his department, who are not members of the committee, *of individuals outside the department,* and of students." (PX–5 p. 2) (emphasis added). Vice-President Wilson testified that it was entirely permissible for a department head to seek outside evaluations, and that Moynihan did not have to show the letters to anyone else. (Tr. 1342–43). Moreover, Moynihan was not motivated by any malice or prejudice in seeking the letters. In fact, Moynihan only sought the outside appraisals after Mrs. Lieberman had complained that no one in the department was qualified to evaluate her work and that they were biased against her. (Tr. 1586, 7201). The outside letters were to be used only if they were positive; thus Moynihan's purpose was to help, not hinder, the plaintiff's case. (Tr. 3641, 5404).

Mrs. Lieberman claims that Professor MacCaffrey was unqualified to judge her scholarship because she was not an expert in "feminist criticism." That field, which was Mrs. Lieberman's primary area of concentration, focuses on the manner in which women are depicted in literature. Despite the plaintiff's protestations to the contrary, numerous witnesses testified that one did not need to be a feminist critic to evaluate

---

10. Although she has not made such a claim in her complaint, the allegation that the University did not follow its own procedures could state a claim under state law, akin to a contract claim. Since the issues arise out of a common nucleus of operative facts and since interests of judicial economy clearly would have been served by hearing such a claim along with the federal issues presented to the Court, the Court would have had pendent jurisdiction over such a claim. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

11. This should not be confused with the practice of soliciting outside letters in the case of an individual who was being considered for promotion to full professor. In that case solicitation of outside letters was the standard practice, not the exception. The practice which evolved with respect to review for full professor was that the candidate, the department head and the promotion and tenure committee would each suggest two people and the evaluators would then be selected from among those six individuals. (Tr. 1508, 1517, 1592). This was not the practice with respect to review for tenure, and there was no requirement that the department head inform the tenure candidate, if he decided to seek outside evaluations.

that kind of criticism. (Tr. 6145, 6480, 8331). While it is true that a specialist in that field would be better able to discuss the scholarly content of the plaintiff's feminist criticism, any professor schooled in English literature should be able to assess the logic of the positions adopted in the articles and to evaluate the mode of presentation. (Tr. 6095). Moreover, Professor MacCaffrey is recognized as a first rate scholar with a high degree of integrity. (Tr. 5404, 6480).

While conceding that Freeman was qualified to judge her article dealing with Linguistics (Tr. 2515), the plaintiff asserts that Freeman was biased. This bias is claimed to stem from the fact that at the time that he read the articles Freeman's wife was employed as a part time instructor in the English department. Thus, it is claimed that he may have wanted Mrs. Lieberman to receive a terminal appointment so that his wife could be appointed in her place. The evidence discloses no such bias. Mrs. Freeman in fact never asked Moynihan for a permanent appointment, and even Mrs. Lieberman's supporters admitted that Professor Freeman's character was such that he would not have submitted a dishonest evaluation in order to secure a position for his wife. (Tr. 4211, 8334).

·The plaintiff also complained that Moynihan implied to Freeman in advance that he wanted a negative evaluation. The very evidence by which the plaintiff attempted to substantiate this claim, the letter in which Moynihan requested that Freeman judge some of her articles, refutes her theory. It reads, in relevant part:

"Would you be willing to read a couple of short pieces—one of them precisely in your field of interest—for me. We have a particularly difficult tenure decision. Our Committee has already made its appraisal, but we'd like someone outside the University to be in on this one. Anonymity will be religiously kept." (PX–22).

If any sinister meaning is hidden in those lines, the Court is unable to find it. Moreover, preserving the anonymity of both evaluators, to which the plaintiff also ob-

jected, is an accepted practice in the academic world and was done in this instance in order to insure more candid appraisals. (Tr. 8481, 8584). Finally, even if there had been some impropriety connected with the solicitation of the outside letters, the plaintiff was not damaged by them. Their contents were not revealed until the meeting of the tenured faculty, and the tenured faculty voted to remand the case to the joint committee for reconsideration—a favorable vote for Marcia Lieberman.

The only other major procedural objection which the plaintiff raised is that the English department's review did not comport with the procedures mandated by the University's Laws and By-Laws. Specifically, she contends that the Provost did not comply with Article X–K–10–d–3, which provides:

"Before a teacher is placed on permanent tenure the Provost shall appoint at least five teachers to act as advisers, and he may follow the same procedure in other cases of proposed advancement, or at the request of a teacher who desires such consideration. These advisers shall normally include representatives both of the candidate's department, and of at least two other departments. The selection of advisers shall be confidential, and those who serve shall, without meeting as a committee, report individually to the Provost their answers to such questions as he may submit to them. Reports shall be confidential, and record thereof kept in summary form only." (PX–1 pp. 40–41).

The University concededly did not follow this procedure. Acting President Gant testified that the last time this procedure was utilized by any department in the University was in 1947. (Tr. 3999, 4018). The purpose of this provision was to insure that the faculty would have some input on tenure cases, so that the recommendations going to the Board of Trustees would not be solely those of the department head and the Provost. (Tr. 4002–03). The department review system—with the promotion and tenure committee and joint committee recommen-

dations followed by submission to the tenured faculty—was designed with a view toward getting broad faculty input. There is also further faculty input from the members of the dean's advisory council.

Gant testified that he believed that utilizing the department review system as provided for in the Provost's Rules (PX–5), in place of appointing a separate five member *ad hoc* committee for each tenure candidate, was justified by Article X–K–10–d–4 of the Laws and By-Laws. (Tr. 3999). That section states:

> "The Provost should experiment with various plans for ascertaining the judgment of a candidate's colleagues concerning his proposed advancement, and should report his results to the Senate for further consideration." (PX–1 p. 41).

Furthermore, Moynihan checked with the chairman of the committee which had drafted the Provost's Rules and was assured that the English department's procedures were consistent with the Provost's Rules which were amended and approved by the faculty Senate in 1972. (Tr. 7571). The opinions of these individuals who drafted these procedures and who work with them on a daily basis must be given "great deference." *Adamian v. Jacobsen,* 523 F.2d 929, 932 (9th Cir. 1975); *Jablon v. Trustees of California State Colleges,* 482 F.2d 997, 999 (9th Cir. 1973), *cert. den.* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). The review procedure followed in the Lieberman case was no different than that employed in all tenure cases within the English department, since the academic year 1967–68.[12] The Court concludes that the procedures employed were consistent both with the Laws and By-Laws and with the Provost's Rules, which were validly promulgated pursuant to Article X–K–10–d–4 of the Laws and By-Laws.

The plaintiff contends that there are several other procedural irregularities of a minor nature. The Court finds no basis for any of these claims. She argues that she should have been invited to meet with the joint committee before the committee first voted negatively on tenure and sent its recommendation to the meeting of the tenured faculty. The evidence established that since 1968 no tenure candidates appeared before the joint committee prior to the vote. (Tr. 6527, 6633, 7238–39). The Provost's Rules guarantee the tenure candidate an interview with the promotion and tenure committee. (PX–5 p. 1). Marcia Lieberman did in fact appear before the five member promotion and tenure committee in the fall of 1972. (Tr. 7139). The joint committee was not also required to grant her an interview. (Tr. 6528). Given the extensive appeals afforded by the University, the plaintiff's claim of an inadequate hearing borders on the frivolous. She eventually did meet with the joint committee, after the tenured faculty voted to recommend reconsideration. She appealed the department's decision to the dean's advisory council and was given a hearing there, and she later presented her case on appeal to the central administration.

The plaintiff also objected to the rule requiring a two-thirds majority for a favorable recommendation from the joint committee. This had been voted on by the English department in 1968 and had been the practice since that time. (DX–A). Moreover, even without the two-thirds rule, the joint committee's initial 5–4 vote in favor of tenure would not have guaranteed her tenure, because it was the University's policy not to grant tenure where the department itself was divided on the candidate's merits. (Tr. 8374).

There was nothing improper in the joint committee's decision to vote by secret ballot. While a secret ballot was not the normal practice (Tr. 140), it was not utilized for the purpose of harming Mrs. Lieberman's case. Rather the committee wanted to avoid any potential embarrassment to its members. (Tr. 7241). The Court cannot

---

12. Prior to that year the practice was to have all the department's tenured faculty deliberate on each tenure case as the department's promotion and tenure committee. During that year the two-tiered committee structure was adopted, because the growth of the English department had rendered the prior practice unwieldy.

discern how the plaintiff could have been prejudiced by the use of the secret ballot.

The Provost's Rules require that the department head inform the tenure candidate of his recommendation; the notification is to be in writing with reasons for his action, if the candidate so requests. (PX–5 p. 2). Moynihan did tell Marcia Lieberman of his decision and the reasons for it. (Tr. 7416). When she requested a written statement he suggested that that might not help her cause, inasmuch as the written reasons would then become a part of her file. She said she would think it over and let him know. She never mentioned the subject again. (Tr. 7415–16). Consequently, he justifiably believed that she was no longer interested in a written statement.

The plaintiff asserts that her promotion and tenure file omitted information about some of her publications and neglected to state that she was a member of a certain faculty committee. The tenure candidates themselves supply this information to be inserted into the promotion folder. (Tr. 7453, 7464). Moreover, Mrs. Lieberman signed the statement in her promotion folder certifying that she had reviewed the factual materials contained therein and found them to be accurate. (PX–159 p. 12). Thus any omissions are clearly the fault of the plaintiff herself.

■ The Court finds that the procedures employed in deciding Marcia Lieberman's tenure case were entirely proper. Moreover, the Court finds that even if there were any procedural irregularities, they were not the cause of her failure to get tenure. Rather, she was denied tenure because of the perceived deficiencies in her cumulative teaching record and her scholarship. Therefore, absent a showing that she would have been granted tenure but for the

procedural defects alleged in her complaint, the plaintiff is not entitled to either reinstatement or compensatory damages, even if she were able to prove that the procedures were in fact defective. *Carey v. Piphus,* 435 U.S. 247, 260, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[13]

### B. SEX DISCRIMINATION

■ Title VII of the Civil Rights Act of 1964 prohibits sex discrimination by an employer. 42 U.S.C. § 2000e–2. As noted earlier, Mrs. Lieberman has satisfied the procedural prerequisites to a Title VII action by filing complaints with the Equal Employment Opportunity Commission and receiving a right to sue letter. 42 U.S.C. § 2000e–5.[14] The rule for allocating the shifting burden of proof in a Title VII case can be extrapolated from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The plaintiff bears the initial burden of showing a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employee's rejection. If the defendant is able to articulate such a reason, the plaintiff must show that the stated reason was a mere pretext for discrimination. The ultimate burden of persuasion remains with the plaintiff, who must convince the court by a preponderance of the evidence that he or she has been the victim of discrimination.

■ In order to establish a prima facie case the plaintiff must prove the following four elements: (1) she is a woman; (2) she was qualified for tenure; (3) despite her qualifications, she was rejected; and (4)

---

13. The plaintiff has not claimed, nor did the evidence disclose, that the claimed denial of procedural due process itself caused the plaintiff any mental distress. *Cf. Carey v. Piphus, supra,* 435 U.S. at 263–64, 98 S.Ct. 1042.

14. Educational institutions were originally exempt from Title VII with respect to teaching personnel. Pub.L. 88–352 § 702. Section 3 of the Equal Employment Opportunity Act of

1972, Pub.L. 92–261, eliminated this exemption effective March 24, 1972. Since the latter statute is not given retroactive effect, any discrimination prior to March 24, 1972 is not cognizable. *Weise v. Syracuse University,* 522 F.2d 397, 411 (2d Cir. 1975); *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

after her rejection the position remained open and the defendants continued to seek or accept applications from persons of her qualifications. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. 1817.

▮▮▮ The crucial question in the present case in determining whether the plaintiff has established a prima facie case is whether she has proven herself qualified for a tenured position.[15] Mere competence on the part of a faculty member is not sufficient to merit tenure at the University of Connecticut:

"Policies for promotion should operate to advance the most promising, and to hold back, or, in accordance with established practices regarding tenure, to eliminate the incompetent and the mediocre." Laws and By-Laws Art. X–K–10–a. (PX–1 p. 37).

In what has become known at the University as "Wilson's Law," Kenneth Wilson provided further explication of the standards for awarding tenure in an April 21, 1969 memorandum to the faculty:

"*When in doubt, don't.* Since the tenure decision is a commitment by the University to twenty or thirty years of support and several hundred thousand dollars of salary, from which there can be no turning back, we have felt that if we must err, we ought to err on the side of caution; we ought not to gamble widely." (PX–66 p. 3) (emphasis in original).

If it were not for a recent Second Circuit opinion applying the *McDonnell Douglas* standard in the context of a university professor, the Court would find that Mrs. Lieberman has failed to prove that she was qualified for tenure and therefore find that she has not established a prima facie case of sex discrimination. In *Powell v. Syracuse University,* 580 F.2d 1150 (2d Cir. 1978), *cert. den.* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979), the district court had held that a black female professor had failed to establish a prima facie case of discrimination, because negative faculty evaluations showed that she was not qualified and because the plaintiff had failed to prove that those who received tenure after she was rejected had qualifications similar to her own. The Second Circuit, abandoning the non-interventionist approach announced in *Faro v. New York University,* 502 F.2d 1229 (2d Cir. 1974),[16] held that this placed too great a burden on the plaintiff. To establish a prima facie case, the court held, the plaintiff need not demonstrate that she was the best qualified candidate for tenure, but merely show that she possessed the basic skills necessary for the job. 580 F.2d at 1155. The court held as a matter of law that the plaintiff had established that she possessed the basic skills by showing that she had been hired after a review of her qualifications and was reappointed after her first year of teaching. *Ibid.* If that is all that need be shown, Mrs. Lieberman has established a prima facie case of sex discrimination.[17]

15. The fact that males were subsequently granted tenure in the English department is a sufficient showing on the fourth factor, *i. e.* that the position remained open and the defendant continued to accept applications. *Powell v. Syracuse University,* 580 F.2d 1150, 1156 (2d Cir. 1978), *cert. den.* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979).

16. The court in *Faro* stated:

"Of all the fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision." 502 F.2d at 1231. The *Powell* court expressed concern that this attitude had "rendered colleges and universities virtually immune to charges of employment

bias, at least when that bias is not expressed overtly." 580 F.2d at 1153.

17. It may be possible to distinguish *Powell* on the ground that in the present case Mrs. Lieberman was given advance notice of the deficiencies in her teaching and scholarship in both the spring of 1971 and the spring of 1972. The *Powell* court quoted with approval the following passage from *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1283 (7th Cir. 1977):

"[T]he employer's acceptance of his work without express reservation is sufficient to show that the plaintiff was performing satisfactorily for the purpose of shifting the burden of proof." 580 F.2d at 1155.

The court also noted that any dissatisfaction with the plaintiff's work "was never communicated to Ms. Powell, who was, accordingly, in

Once the plaintiff has established a prima facie case, it is up to the defendants to rebut that showing. The Supreme Court has recently clarified the showing that the defendant must make in order to rebut the plaintiff's prima facie case. In *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169 (1st Cir. 1978), the court of appeals had required the employer to "prove absence of discriminatory motive" once the plaintiff had made a prima facie showing. The Supreme Court vacated the judgment, holding that this standard placed too great a burden on the employer. Emphasizing that the burden of proof always remains with the plaintiff and stressing that the defendant need not prove lack of discriminatory motive, the Court held that all the employer needed to do in order to rebut the plaintiff's prima facie case is to "articulate some legitimate, nondiscriminatory reason" for the refusal to hire the plaintiff. 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

The Court finds that the defendants have successfully rebutted the plaintiff's prima facie case. Indeed, rather than merely articulating some legitimate, nondiscriminatory reason for the terminal appointment, the defendants have affirmatively proven that the reason that Marcia Lieberman was not granted tenure was the honest and sincere belief of those who were charged with evaluating her work that neither her teaching nor her scholarship were of sufficient quality to merit a lifetime appointment.

Proof of discriminatory motive is critical in a case, such as the present one, in which the nature of the discrimination charged is "disparate treatment" rather than "disparate impact."[18] *Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Thus, the Court's function is merely to assess the reason for the defendants' decision not to grant the plaintiff tenure; the wisdom of that decision is not before the Court. As the Second Circuit has recognized:

"[T]he law does not require, in the first instance, that employment be rational, wise, or well-considered—only that it be nondiscriminatory." *Powell v. Syracuse University, supra,* 580 F.2d at 1156–57.

In a similar vein it has been held:

"This court is powerless to substitute its judgment for that of the University as to whether plaintiff's academic credentials are such that tenure should have been awarded. The judiciary is not qualified to evaluate academic performance. . . . The courts will not serve as a Super-Tenure Review Committee." *Keddie v. Pennsylvania State University,* 412 F.Supp. 1264, 1270 (M.D.Penn.1976). *Accord, Megill v. Board of Regents of State of Florida,* 541 F.2d 1073, 1077 (5th Cir. 1976).

Since the plaintiff's actual qualifications are not at issue, "a sincere belief that a person is not qualified for a job is an adequate justification for an employment decision and rebuts a complainant's prima facie case." *Smith College v. Mass. Commission Against Discrimination,* 380 N.E.2d 121, 127 (Mass.1978).

---

no position to disprove these alleged inadequacies." 580 F.2d at 1155. Thus, it would be possible to construe *Powell* as holding that the dispositive factor in determining whether the plaintiff has established a prima facie case is whether or not she was given some advance warning of her inadequacies. On the other hand, the *Powell* court appeared to be saying that the fact that the plaintiff's qualifications were reviewed prior to her initial appointment plus the fact that she was thereafter reappointed is sufficient to shift the burden of going forward to the defendant. *Ibid.* Inasmuch as the Court is persuaded that the defendants

have rebutted any prima facie case which the plaintiff may have established, the Court need not resolve this issue.

18. "Disparate treatment" occurs when the employer treats some individuals less favorably than others because of their race, religion, sex or national origin. A "disparate impact" case involves a practice which is facially neutral but in fact falls more harshly on one group than another. Proof of discriminatory motive is not essential to a disparate impact case. *Teamsters v. United States, supra,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843.

The credible evidence in the present case demonstrates that at every level of the review process there were sincere doubts about Marcia Lieberman's qualifications. The three factors which must be assessed when making the tenure decision at the University of Connecticut are teaching, scholarship and service to the University. Marcia Lieberman's service to the University, particularly her pioneering efforts in a black literature course and her contributions to the women's liberation movement, were given adequate consideration by the English department. (Tr. 6489, 9223). However, service was considered much less important than the other two criteria, and Vice-President Wilson had stated to Moynihan that her service could not alone warrant tenure if her teaching and scholarship did not measure up. (Tr. 48, 7889-91).

The University has developed two methods for evaluating a professor's teaching ability. Surveys are taken among students who have been enrolled in a particular course, and teachers are rated on a numerical scale. In addition, members of the department review committees may visit classes for a first-hand appraisal. Teachers must be given advance notice of such visits, so that they can put their best foot forward. (Tr. 5383-84).

A list of the student ratings in the English department compiled in November, 1972 shows that the cumulative ratings for members of the department ranged from a low of 4.09 to a high of 8.95 (DX-N). Mrs. Lieberman had a cumulative rating of 7.06, which ranked her 12th out of the 15 junior faculty members. (DX-SS, DX-444). However, this 7.06 figure included the ratings from the spring semester of 1971-1972, in which the plaintiff received a rating of 8.18, which was substantially higher than her previous ratings. Prior to this rating in the spring of 1972, the plaintiff's cumulative rating was 6.7 (Tr. 8264).

The promotion and tenure committee delayed reaching a decision on Mrs. Lieberman's case until the spring ratings came out, in the event that her teaching ratings had improved. (Tr. 7254). The committee had already reached a consensus that her scholarship was so weak that her only chance for receiving tenure would be on the basis of her teaching. (Tr. 7254). Moynihan testified that it would be a mistake to place too much emphasis on a teacher's rating for a single semester, just as it would be misleading to judge a baseball player by his last week's performance instead of looking at his batting average for the entire season. (Tr. 7921).

Even those who supported Marcia Lieberman's tenure case did not give her teaching their overwhelming support. Joan Hall, who was a close friend of the plaintiff and acted as her advocate throughout the proceedings, conceded that prior to the spring 1972 ratings the plaintiff's teacher ratings were not strong enough to merit tenure. (Tr. 9290). Similarly, Lee Jacobus, who voted in the plaintiff's favor at the meeting of the tenured faculty, testified that he felt she had a lot to learn about teaching. (Tr. 5396). Charles Owen, who voted for tenure when Marcia Lieberman's case was before the promotion and tenure committee, said her teaching was average. (Tr. 814-, 1888-91). Joseph Cary, who voted in favor of both tenure and promotion in both the promotion and tenure and joint committees, said that he had dreaded visiting one of Marcia Lieberman's classes in the fall of 1972, because he anticipated that it would not be very good. He was relieved to find that it was "all right." (Tr. 7254). Donald Gibson, the other committee member to visit one of the plaintiff's classes, found her teaching to be average. (Tr. 5961-62). None of these appraisals can be classified as unmitigated praise, such as would overcome a weak record of scholarship. Furthermore, several students had complained that Marcia Lieberman's courses in literature were one-dimensional, focusing on the feminist aspect to the exclusion of other important themes contained in the writing under discussion. (Tr. 2805, 5573, 6020, 7599-7601).

The appraisals of Marcia Lieberman's scholarship are even more damning. Joseph Cary, who considered himself a friend of Mrs. Lieberman and who had the reputa-

tion of being soft on tenure decisions [19] and who had in fact voted in Marcia Lieberman's favor in the joint committee as well as the promotion and tenure committee and the meeting of the tenured faculty, judged the Linguistics articles which Marcia Lieberman had co-authored with her husband as being not second rate, but fifth rate. (Tr. 3032). In fact he stated that the editor of the journal in which one of the articles was published was "looney" for having accepted it. (Tr. 3035). Jack Davis expressed "grave reservations" about the plaintiff's scholarship. (Tr. 868). He viewed her feminist essays as advocacy, rather than disinterested scholarship, and stated that the articles endorsed a theory uncritically without considering contrary evidence. (Tr. 869). Davis voted in favor of tenure at both the promotion and tenure committee and the joint committee, in spite of these reservations, because he felt friendly towards her, because he had never voted against tenure in the past, and because he felt there would be trouble if she did not get tenure. (Tr. 908–911). Charles Owen, who had voted in favor of tenure in the promotion and tenure committee, termed Mrs. Lieberman's scholarship "very marginal." (Tr. 1888–91).

When Moynihan asked Francelia Butler, a member of the English department, for her opinion on Marcia Lieberman's scholarship, she stated that she admired Marcia's feminism and her work in the women's movement and declined to comment on her scholarship, stating she did not wish to say anything that would be detrimental to Marcia's case. (Tr. 7389). When testifying in court about the quality of a particular article which Marcia Lieberman had written, Professor Butler called it shallow and stated that she herself could have written the article in an afternoon. (Tr. 9098–99). Carol Ohmann, a professor at Wesleyan who wrote an evaluation of Mrs. Lieberman's work at the latter's request, testified

that she hoped that Mrs. Lieberman would get tenure, in part because she is a woman. (Tr. 9566). Her evaluation, which was proferred with a view towards aiding the plaintiff's case, confesses that one of the three articles she read has a "major fault." (PX–21). Even Joan Hall, Marcia Lieberman's most vocal supporter, was not enthusiastic in her praise of the plaintiff's scholarship. (Tr. 6827–28).

In short, the plaintiff's case in the two departmental committees, was considered borderline. This is reflected not only in the close votes on tenure in the joint committee and the meeting of the tenured faculty, but also in the votes against promotion. Promotion from assistant to associate professor was considered the normal concomitant of tenure; the feeling was that if an individual had not proven herself worthy of promotion after six years, then she was not deserving of a lifetime commitment. (Tr. 1191, 4092, 4804–05, 5365). Even Joan Hall and Thomas Roberts, who wrote a letter to Dean Lougee on behalf of the plaintiff (PX–159, Catalog No. 20), agreed that it was a close case and said they could understand why others would have honest reservations about granting the plaintiff tenure. (Tr. 2389, 386, 7494). The Court accordingly finds that those who voted negatively in the departmental committees on the tenure question did so in the honest belief that the plaintiff was not deserving of tenure, because of the deficiencies in her cumulative teaching record and her scholarship.

As weak as the plaintiff's claim of discrimination in the departmental committees is, the case against the department head is even weaker. It was Moynihan who first offered Mrs. Lieberman a part time position as lecturer. When a vacancy occurred in the second semester, it was Moynihan who gave Mrs. Lieberman the job as instructor. Moynihan reappointed her to a temporary position in 1968–1969, and then encouraged Charles Owen to attempt to secure a posi-

---

19. The previous year the joint committee had voted five to four in favor of granting tenure to Professor Orza, which under the two-thirds rule was a negative vote. The next morning Cary appeared at Moynihan's back door, stating that he wished to reconvene the joint committee and change his vote. Cary had had a dream in which Don Quixote had come to him and said, "If you must err, err on the side of charity." (Tr. 7156).

tion for her for the 1969–1970 year, while Owen served as acting head in Moynihan's absence. Moynihan then recommended that she be given the tenure track position she desired, overruling the English department's promotion and tenure committee. Moynihan recommended that Mrs. Lieberman be reappointed in each of the next two years. When her case was before the meeting of the tenured faculty, Moynihan voted to break the tie and send the case back to the joint committee for reconsideration. Finally, when the decision was made to offer Mrs. Lieberman a terminal appointment, Moynihan offered his aid in obtaining her a position at one of the branches of the University of Connecticut. She declined this offer of aid. (Tr. 7153–54).

During the time Mrs. Lieberman was at the University, a total of 19 people on the departmental committees had read her work. Of these, 13 or 14 found it very weak, and only three had told Moynihan they thought it fair to good. (Tr. 7501). These negative evaluations, combined with Mrs. Lieberman's low cumulative teacher ratings, would have justified a terminal appointment prior to 1972–1973, However, Moynihan continued to recommend Mrs. Lieberman for reappointment, in order to give her the full probationary period in which to prove her merit. (Tr. 563, 7513). Witness after witness, including some of those who supported Mrs. Lieberman, testified to Moynihan's fairness, and some stated that he did his best to present her case in the best possible light. (Tr. 5403–04, 6413). Moynihan did not attempt to influence the vote of anyone, and asked only that an objective, professional judgment be made. (Tr. 847, 884). In light of all this evidence, Mrs. Lieberman's claim that Moynihan was prejudiced against her is incredible.

There is a similar dearth of evidence of discrimination in the proceedings both at the dean's advisory council and the central administration. The review conducted at those levels is akin to that of an appellate court. They do not make an independent assessment of the tenure candidate's merit, but review the procedures to ensure that the proper factors were considered and the decision was made in an appropriate manner. (Tr. 8319, 8321–22). One member of the advisory council, a retired English professor, did read Mrs. Lieberman's feminist criticism and reported to the council that it was "trivial or trash." (Tr. 8003). Even Cynthia Peterson, who voted in the plaintiff's favor at the dean's advisory council and testified in her behalf at trial, admitted that it was "a borderline case," and was unable to point to any concrete evidence of sexism in the department's proceedings. (Tr. 7999, 8029). The most she could say was that the talk about Mrs. Lieberman not "fitting in" the English department *may* have been evidence of sexism, but she also conceded that it was just as likely that this was due to Mrs. Lieberman's abrasive personality. (Tr. 8018–19). A clash of personalities is not a sufficient basis for liability; there must be evidence of sex discrimination. *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1367 (W.D.Penn.1977).

Dean Lougee's negative recommendation on tenure was precipitated by what he saw in Mrs. Lieberman's promotion and tenure file, not by any bias. In his three years as dean he had never recommended tenure after negative action by the department, the department head and the advisory council. (Tr. 8098). The issue of possible sexism had been discussed at length in the dean's advisory council, and the council believed Moynihan when he responded that sexism had played no part in the department's decision. (Tr. 474, 496, 502–04, 8024). Lougee could justifiably trust Moynihan's judgment. He had known Moynihan and had worked with him for fifteen years, and had come to trust him. When Lougee reviewed Moynihan for reappointment as department head he polled the members of the English department and all agreed that his fairness and objectivity in personnel decisions was unimpeachable. (Tr. 8095).

Vice-President Wilson also had known Moynihan for many years and had come to trust his judgment and his integrity. (Tr. 8327). Wilson also knew Professor Donald

Freeman, who had written an evaluation critical of Mrs. Lieberman's work, and respected his judgment and integrity. In fact, Wilson had been Freeman's dissertation advisor and he found Freeman's to be one of the two or three best dissertations that he had advised. (Tr. 8332–33). Professor Thomas Roberts, who interceded with Wilson on Mrs. Lieberman's behalf, told Wilson that Freeman was qualified to judge her essays and that he himself would have selected Freeman. (Tr. 8334). Roberts stated that Mrs. Lieberman's scholarship was not strong, but that it was good enough to warrant an award of tenure. (Tr. 8338–39). He told Wilson that the department had been fair to Mrs. Lieberman and that the criticism directed against her was scholarly and not personal. (Tr. 8339).

Wilson asked Moynihan, Lougee and others if there were any indications of bias against Mrs. Lieberman, because of her sex or her activities on behalf of women, and he was informed that there was no such evidence. (Tr. 8366, 9235). Gant, Wilson and Orr were so concerned over the question of sexual prejudice that they questioned Moynihan more intensely over Mrs. Lieberman's tenure case than any other case Moynihan had ever been involved in. (Tr. 1679). Gant testified that it was normal for promotion to be awarded with tenure and the fact that the joint committee had voted 7–2 against promotion and the dean's advisory council had unanimously recommended against promotion was significant in his decision to recommend a terminal appointment. (Tr. 4092, 4095).

The Board of Trustees also devoted more time to Mrs. Lieberman's case than was normal. The Board must act on 250–300 cases for tenure and promotion at the March meeting, in addition to conducting other business. (Tr. 1211). For this reason the members of the Board do not normally look at each promotion and tenure file when voting on the President's recommendations. (Tr. 4649). In this case the Board, being alerted to and concerned over the allegations of sexism and improper treatment raised by Mrs. Lieberman's attorney

in a letter to the Board, spent 20–30 minutes discussing the case. (Tr. 1232, 1237). Gant informed the Board that an investigation had been conducted with respect to the claims made by the plaintiff's attorney, and stated that all the appropriate procedures had been followed. (Tr. 4113–14, 4698). The Trustees' conduct in this case was entirely proper. As was recognized in a similar case:

"The trustees have no duty to supervise the day to day activities of the university or to become involved in personnel decisions affecting more than 6,000 employees, including the 200–300 tenure decisions every year. There is no evidence that the trustees have ever become involved in specific faculty appointments or tenure decisions, nor should they do so. The trustees are not competent to determine whether a particular faculty member is, or is not, qualified for tenure." *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1349.

The evidence in this case discloses that at every level those who were responsible for making the decision to give Mrs. Lieberman a terminal appointment were meticulous in their deliberations and sensitive to the claims of sexual bias. The departmental committees "agonized" over the decision, and even Mrs. Lieberman's next door neighbor, a friend of hers, testified that there was no bias. (Tr. 6313–14, 6416). Dean Lougee testified that more time was spent at the dean's level on this case than on any other, and he himself read the file ten times before reaching a decision. (Tr. 982). As stated previously both the central administration and the Board of Trustees spend an inordinate amount of time on this case and could uncover no evidence of sexual or political bias. The Court therefore concludes that all defendants have articulated a legitimate, non-discriminatory reason for denying the plaintiff tenure—namely, the weaknesses perceived in her cumulative teaching and, more particularly, in her scholarship—and have successfully rebutted the plaintiff's prima facie showing.

In an attempt to demonstrate that the reasons for denying her tenure were merely a pretext for sexual discrimination, the plaintiff cites the outside letters which were solicited by Moynihan, the fact that she was twice reappointed during her probationary period, a change in the standard for qualifying for tenure, and the low percentage of women in the English department.

As the Court has already noted, in its discussion of the plaintiff's procedural claims, Moynihan intended to use the outside letters only if they had been favorable to Mrs. Lieberman. Thus seeking the letters is not evidence of discrimination; it was done to help her case for tenure. Inasmuch as the letters only confirmed what others had already stated about her scholarship and in fact were not read until after the joint committee's first unfavorable vote, they did not prejudice Mrs. Lieberman's case. Moreover, it was entirely proper under the Provost's Rules for Moynihan to solicit such evaluations.

The plaintiff claims that Moynihan's recommendations for reappointment for 1971–72 and 1972–1973 indicate that he thought at that time that she was qualified for tenure, and that he suddenly switched his position in the fall of 1972. The form which is used by the department head to make his recommendation on reappointment requires that he check one of the following boxes, when he makes a recommendation for reappointment:

"3. Please check the statement which is appropriate, and sign this sheet.

( ) This faculty member is performing competently through this, the _____th probationary year at The University of Connecticut, and my present estimate is that he will earn promotion in about average time, and tenure at the end of the probationary period in September, 19____.

( ) This faculty member is performing in superior fashion in this, the _____th probationary year at The University of Connecticut, and my present estimate is that he will earn promotion somewhat earlier than average, and tenure at the end of the probationary period in September, 19____.

( ) This faculty member is not performing as well as we had expected; nonetheless, I recommend reappointment for another probationary year (this is his _____th probationary year at The University of Connecticut) in the hope that he may in that period overcome the weaknesses we have seen. At present I am in doubt as to whether he will earn promotion or tenure in due course.

Signed:_____

Department Head"

For both years in which the plaintiff was up for reappointment, Moynihan checked the first box. (PX–27, 28).

Professor Curtin, a member of the executive committee, testified that the third box was customarily not checked even in cases where the executive committee felt that the faculty member was not performing adequately. This was done because the executive committee wished to give the faculty member the complete probationary period in which to establish himself, and it was feared that if the third box were checked the dean's advisory council would veto the reappointment. (Tr. 6624, 6627). Professor Owen testified that the standards for tenure were more stringent than for reappointment and that reappointment was "almost automatic" when the faculty member was on the tenure track. (Tr. 6870).

Mrs. Lieberman certainly knew that the two reappointments were not tantamount to a guarantee of tenure; each time she was reappointed she received a warning from the promotion and tenure committee that she should work on improving her scholarship. (Tr. 1181, 1183, 1947, 5958). Indeed, Mrs. Lieberman's own actions indicate that she knew her case for tenure was weak. Most faculty members who have prior teaching experience try to count as much time as possible toward the seven year probation, so that they can be considered for tenure earlier. Mrs. Lieberman asked that none of her previous three years at the University count towards the proba-

tionary period, in effect putting off the tenure decision for another seven years (DX–000). This demonstrated a lack of confidence on Mrs. Lieberman's part as to her chances for tenure. (Tr. 7085).

The plaintiff asserts that the standards for achieving tenure were artificially raised in 1972–1973 in an effort to defeat her. The most convincing testimony established that Moynihan's instructions to the joint committee were the same as he had always given and that neither the department nor the dean's advisory council raised the standards in 1972–1973. (Tr. 896, 432, 3055, 6809). Moreover, any raising of standards which may have occurred over the years was the result of an effort to upgrade the quality of professors at the University, and was not directed at women generally or the plaintiff specifically. (Tr. 4791, 4801, 8074–75). As the Second Circuit has recognized, the decision to grant tenure, which encompasses many intangibles, must necessarily be in part a subjective one:

> "The computer, highly developed though it be, is not yet qualified to digest the punch cards of an entire faculty and advise the waiting and expectant onlookers of its decision as to hiring or promotion." *Faro v. New York University, supra,* 502 F.2d at 1232.

Nevertheless, the University of Connecticut, with its three criteria of teaching, scholarship and service and its comprehensive procedures for reaching the decision, has made the process as objective as is possible. It has been recognized that "the peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution," and that the decision on tenure "can only be made by the colleagues with whom the faculty member has worked." *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1346.

The plaintiff introduced statistical evidence to buttress her claim of sex discrimination. She offered evidence which indicated that there was a low percentage of female assistant instructors on the tenure track in the English department in 1968, 1969, and 1970. (PX–134, 135, 136). In the first place, it should be noted that these statistics only relate to the period prior to the time Title VII became applicable to the University of Connecticut. Although evidence of discrimination prior to that time may be probative on the issue of discrimination, the purposeful exclusion of all women prior to March 24, 1972 by the University of Connecticut would not have violated Title VII. *Hazelwood School District v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Moreover, the more telling statistic is not the simple percentage of women in the English department, but the change in percentage over the years. When Moynihan was first appointed head of the department in 1966 there were 2 women out of 43 people in the department. In 1972, when the tenure decision was made on Mrs. Lieberman, 8 of the 52 members of the department were female. Thus, of the 9 new positions created during Moynihan's tenure, 6, or two-thirds, were filled by women. (Tr. 7246).

The plaintiff had been instrumental in opening the University's main athletic facility to women, and she claimed that this had caused some of the faculty to vote against her. Both David Sonstroem and Alexander Medlicott had made some verbal criticism as to Mrs. Lieberman's having taken away "their" locker room. (Tr. 2081–82). However, neither one ever expressed an intention to retaliate against her professionally, and Sonstroem had in fact voted for tenure when her case was first before the joint committee. (Tr. 6650–51, 6666).[20] Moynihan had also commented to her, in a joking manner: "Marcia, you can have the Department, but leave me my locker." (Tr. 7130). Another incident which the plaintiff claims constitutes evidence of a sexist attitude is Charles McLaughlin's remark to the effect that "[W]omen [have] got to do twice as good as men in order to be qualified." (Tr. 6111). This remark was merely meant to

---

**20.** On subsequent votes, Sonstroem, feeling that his initial vote had been based on humanitarian rather than professional grounds, voted against tenure. (Tr. 1387, 1389).

console Mrs. Lieberman after the promotion and tenure committee had recommended that she not be given a tenure track appointment in the fall of 1969. It was not an accurate reflection of the treatment given to women in the English department. (Tr. 6114–15).

The Court finds that none of this evidence is sufficient to support a finding that the decision to deny the plaintiff tenure was based on sexual prejudice. Mrs. Lieberman never distinguished herself as either a scholar or a teacher. It is not likely that she would ever have been hired by the University in the first place, had it not been for the desire to attract her husband; and the weaknesses which were found in her dissertation continued to affect the quality of her scholarship. (Tr. 5976–77). Joan Hall, who championed Mrs. Lieberman's cause, addressed the ultimate issue before the Court. She was asked: "Do you think that anyone who voted on this case in fact thought her work was good enough to merit tenure, but in fact voted otherwise, knowingly voted otherwise?" Her response was: "No." (Tr. 377). The Court, after hearing all of the evidence, concurs with Mrs. Hall, and therefore holds that the denial of tenure to Mrs. Lieberman did not violate Title VII of the Civil Rights Act of 1964.

As further evidence of sex discrimination the plaintiff alleges that she received a lower salary than males of comparable skill and experience in the English department. Defendants' Exhibit FFF is a compilation of the salaries for all those holding temporary one year appointments in the English department for the years 1967–1970. In 1967–1968, Mrs. Lieberman was compensated at an annual salary of $9,000, which was more than the other two temporary appointees, both of whom were males. The following year she received $9,850, which was more than any of the other five temporary appointees, four of whom were males. The normal rate for an assistant professor with her experience would have been $10,040.

(PX–93). The reason she received a lesser amount was not sex discrimination, but rather the manner in which temporary appointments are funded. Professors who are on leave generally receive some percentage of their pay; the remainder of their salaries is used to compensate the temporary appointees who fill the positions in their absence. In 1968–1969 Mrs. Lieberman's position was funded from the unused salaries of Professors Weil, in the amount of $5475, and Wilcox, in the amount of $4375, for a total of $9850. This procedure was explained to Mrs. Lieberman and she agreed to accept the position with the knowledge that she would not receive the same salary as a permanent assistant professor with her experience. (PX–93, Tr. 6976).

The following year Mrs. Lieberman received $10,840, the same amount as the other woman in the department who did not have a tenure track appointment. The two temporary males received more, one got $11,000 and the other $11,460. The difference was due to the males' greater teaching experience. (Tr. 7047). Similarly, the defendants introduced evidence which showed that women in the English department were sometimes given a higher salary than their male counterparts, reflecting the female's greater experience or promise. (Tr. 6957).

Defendants' Exhibit EEE is a chart showing the salaries of those who were appointed to the tenure track from 1967 through 1973. In her first year on the tenure track, 1970–1971, Mrs. Lieberman received $11,000. This was the same amount given to all other assistant professors who started on the tenure track that year, with the exception of Henry Blackwell whose salary was $13,700.[21] Blackwell was given a premium because he was a black, and therefore in great demand, and because his salary was partially funded by the Center for Black Studies. (Tr. 7077). The next year all who had started on the

21. With the exception of Blackwell all who came on the tenure track in 1970–1971 were compensated at the same rate, regardless of the number of degrees or prior teaching experience. Thus, Leeming who had received $11,000 the previous year on a temporary appointment, did not even get a raise. (Tr. 7079).

tenure track with Mrs. Lieberman were given identical one step raises of $530, with the exception of Professor Leeming who was given a step and a half increase because of his outstanding performance, and Sister Raphael Joseph who received only a $400 boost. (Tr. 7125–7128). In 1972–1973 the raises were uniform. In her final year Mrs. Lieberman received no increment, because she had been given a terminal appointment. (Tr. 6679). The evidence discloses that Mrs. Lieberman was compensated according to the normal procedures employed by the University and never received a lower salary because of her sex.

■ The Court therefore finds that the plaintiff has failed to satisfy her burden of proving that she was the victim of sexual discrimination either with respect to the compensation she received or the denial of tenure.[22]

## C. First Amendment Claim

■ Mrs. Lieberman contends that the decision to deny her tenure was in retaliation for her efforts to improve the plight of women at the University of Connecticut. Such an allegation, if proven, would constitute a denial of the plaintiff's First Amendment rights and would be actionable under 42 U.S.C. § 1983. *Perry v. Sinderman, supra,* 408 U.S. at 597, 92 S.Ct. 2694; *Mt. Healthy City Board of Education v. Doyle,*

429 U.S. 274, 283–284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This allegation also states a cause of action under § 704 of Title VII, 42 U.S.C. § 2000e–3(a), which prohibits retaliation against an employee for advocating equal employment opportunities.[23]

■ This claim raises the very same issue as the plaintiff's claim of sex discrimination, i. e. the defendants' motivation for denying the plaintiff tenure. The plaintiff must prove not merely that her political activities were a "primary" factor in the decision to terminate her, but that she would have been retained *but for* her political activities. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The philosophy behind this rule was stated in *Mt. Healthy City Board of Education v. Doyle, supra:*

"A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer uncertain of the correctness of its decision." 429 U.S. at 286, 97 S.Ct. at 575.

22. The plaintiff also attempted to introduce approximately ten personnel files concerning the tenure proceedings of others in the English department, by way of comparison to the treatment the plaintiff received. Recognizing that such evidence would have had some minimal probative value, the Court, exercising its discretion under Fed.R.Ev. 403, excluded it on the ground that such probative value would be substantially outweighed by the delay and waste of time, which introduction of such evidence would have necessarily entailed. If the Court had permitted the plaintiff to produce such evidence, it would have been necessary to permit the defendants to offer rebuttal evidence, as to why University authorities had thought that those others who had received tenure were superior to the plaintiff. Instead of trying one case, the Court would have had to compare the merits of all those who had gone through the tenure track at the time the plaintiff was at the University. The plaintiff's case without such evidence seemed almost interminable, consuming 52 trial days over a two-year period. That is long enough.

23. That statute reads:

"(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."

The Supreme Court lightened the plaintiff's burden of proof somewhat in *Mt. Healthy*, holding that once the plaintiff established that constitutionally protected conduct was a "substantial factor" in the decision to terminate him, the burden would shift to the employer to show that it would have reached the same decision even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. 568.[24]

As has been demonstrated in the preceding pages, the motivation of those who voted on Mrs. Lieberman's tenure case were neither sexual nor political. She was denied tenure because of an honestly held belief that her cumulative teaching record and her scholarship were inadequate. Because of the charges which had been made by Mrs. Lieberman, more attention was given to this case than the usual tenure case. The committees were especially attuned to any indications of sexual or political bias. (Tr. 6416). Yet even Mrs. Lieberman's most ardent supporters, including Mrs. Hall and those who wrote to the central administration on her behalf, could find no evidence of bias against Mrs. Lieberman because of her political activities. (Tr. 6416, 8339, 6228–29, 5521, 5480). The most her supporters could say is that they thought that those who voted against Mrs. Lieberman made mistakes in evaluating her; that, however, does not constitute political bias or retaliation. (Tr. 5348).

The Court accordingly finds that the defendants violated neither Mrs. Lieberman's First Amendment rights nor the dictates of 42 U.S.C. § 2000e–3(a).

### D. Civil Rights Claims

The complaint charges the defendants Moynihan, Owen, Gant, Orr, Wilson and Lougee with having conspired to deprive the plaintiff of her rights to due process, equal protection, and freedom of expression, in violation of 42 U.S.C. § 1985(3).[25] The complaint further alleges that the defendant members of the Board of Trustees, with the knowledge of this conspiracy and the power to thwart it, failed to prevent these deprivations of her constitutional rights, in violation of 42 U.S.C. § 1986.[26]

---

**24.** The Court is cognizant of the fact that neither *Givhan* nor *Mt. Healthy* is expressly applicable to § 704 of Title VII. However, the burden placed on the plaintiff for vindication of *constitutional* rights would surely be no greater than that imposed for the assertion of *statutory* rights.

**25.** Section 1985(3) provides:

"(3) If two or more persons in any State or Territory conspire to go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

While the plaintiff has not attempted to make such a claim, the Court notes that the Supreme Court has recently held that a violation of Title VII may not be used to support a § 1985(3) cause of action. *Great American Federal Savings & Loan Ass'n v. Novotny*, —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

**26.** That section states:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty

 The Court has already determined that the plaintiff was not deprived of due process, equal protection, or freedom of expression, and the Court further finds that there was no such conspiracy which had the deprivation of the plaintiff's rights as its object. Each of the named defendants acted within the scope of his official position and according to his sincerely held beliefs about the plaintiff's worth as a professor. Moreover, the defendants could not as a matter of law be liable under § 1985(3), due to the intracorporate conspiracy doctrine. That doctrine, which emanates from the common sense proposition that one cannot conspire with himself, holds that:

> "[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single corporation acting exclusively through its own directors, officers and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), *cert. den.* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978).

Since the present defendants were all acting in their capacities as officers and employees of the University of Connecticut at the time of the alleged conspiracy, there can be no liability under § 1985(3). *Cole v. University of Hartford*, 391 F.Supp. 888, 892 (D.Conn.1975); *Keddie v. Pennsylvania State University*, 412 F.Supp. 1264, 1276 (M.D.Penn.1976).[27]

 Liability under 42 U.S.C. § 1986 is derivative in nature; thus, "no claim for relief under Section 1986 will lie unless a valid claim has first been established under Section 1985." *Johnston v. National Broadcasting Company*, 356 F.Supp. 904, 909

(E.D.N.Y.1973); *Huey v. Barloga*, 277 F.Supp. 864, 875 (N.D.Ill.1967). Therefore, because the plaintiff has failed to establish the existence of any conspiracy in violation of § 1985(3), the Board of Trustees cannot be found liable under § 1986. Even if a conspiracy among the department, the dean, and the officials in the central administration had existed, the Board of Trustees justifiably relied on the representations of the officers that the proper procedures had been followed and that there was neither sexual nor political bias. Since actual knowledge of the conspiracy is a prerequisite to liability under § 1986, this fact would also shield the Board of Trustees from liability. *Buck v. Board of Elections of City of New York*, 536 F.2d 522, 524 (2d Cir. 1976).

Consequently, the Court finds that the plaintiff has failed to prove a cause of action under either 42 U.S.C. § 1985(3) or § 1986 as to any of the defendants.

## E. Defamation

The fifth count of the complaint alleges that the defendants Moynihan, Owen and Lougee defamed Mrs. Lieberman by impugning her professional skill and charging her with improper conduct.

Annex III to the plaintiff's complaint specifies three areas in which the defendants are alleged to have defamed the plaintiff. First, Moynihan and Owen made oral statements to the dean's advisory council concerning the plaintiff's improper attempts to have those faculty members who were favorably disposed towards her elected to the promotion and tenure committee and the executive committee. Second, Moynihan, in his written recommendation

---

of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

27. Although the defendants were named in their individual as well as their official capacities, the evidence disclosed that all their actions were taken in the course of their official duties. As Judge Blumenfeld observed in *Cole v. University of Hartford, supra*, 391 F.Supp. at 893:

> "Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege [and prove] that they acted other than in the normal course of their corporate duties."

which became part of the plaintiff's promotion and tenure file, made the following observations:

". . . Despite the 5–0 vote for tenure, three members of this Committee [the promotion and tenure committee] told me privately that they felt Ms. Lieberman's teaching was only average and her writing very marginal."

". . . She tends increasingly to see all literature as it bears on the woman question, and her classes have been increasingly directed, whatever the supposed subject, by her consuming interest in the feminist movement."

Finally, Dean Lougee, as part of his written recommendation to the central administration and the Board of Trustees, stated:

"Two questions make a decision in this case particularly difficult, namely, whether sexist bias has swayed the judgments made by the departmental Promotion and Tenure committee and the tenured faculty, and whether the candidate has resorted to improper and non-professional activities in her own behalf. While some evidence for the latter has appeared, I have not discovered significant indication that any sexist movement exists in the department or that, at least, any conscious sexist prejudice has been directed at Mrs. Lieberman."

Each of these representations is true, and it is hornbook law that truth is an absolute defense to the torts of libel and slander. Prosser, *Law of Torts*, § 116 (4th ed. 1971); *Bartlett v. Flaherty*, 155 Conn. 203, 205, 230 A.2d 436 (1967). It is true that in the spring of 1972 the plaintiff attempted to have elected to the departmental committee persons who would react favorably to her case for tenure. Although these efforts were considered unprofessional, they were not a material factor in the decision to give her a terminal appointment. (Tr. 475–76, 496–97, 5480). Of the five member promotion and tenure committee, all of whom voted for tenure on the initial preliminary vote, Owen, Davis and Curtin had each made the remark attributed to them by Moynihan. (Tr. 1888–91, 7431). The other statement made in Moynihan's recommendation was based on the complaints he had received from several students, to the effect that Mrs. Lieberman's interest in feminism caused her to ignore other important themes in literature. Finally, Lougee's conclusion that sexual prejudice did not play any significant role in the tenure proceedings is the same conclusion reached by this Court.

Moreover, even if the statements made had not been true, the defendants are entitled to a qualified privilege. All of the statements were made in good faith and in the regular course of the tenure proceedings and there was no publication beyond those to whom the defendants were required to report their recommendations. Therefore, even if the statements had not been true, the defendants would be entitled to qualified privilege, which the Court finds was not exceeded. Prosser, *supra*, § 115.

The Court finds no merit in any of the plaintiff's claims; accordingly, judgment will enter in favor of all defendants on all counts of the complaint.

SO ORDERED.