**Priscilla TIMPER, Plaintiff,**

v.

**The BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant.**

No. 78–C–76.

United States District Court,
W. D. Wisconsin.

Findings of Fact Aug. 29, 1980.

Opinion and Order April 30, 1981.

Cheryl Rosen Weston, Madison, Wis., for plaintiff.

Steven C. Underwood, Asst. Atty. Gen., of State of Wisconsin, Madison, Wis., for defendant.

## FINDINGS OF FACT

DOYLE, District Judge.

Upon the basis of the entire record herein, I find as fact:

Plaintiff is a female. She was employed by the Board of Regents of the University of Wisconsin System at its campus located in Menomonie (UW-Stout) in January 1972, for the second semester of the academic year 1971–1972. Her employment was as a sociologist within the discipline of sociology/social·work in the Department of Social Sciences (Department). Her contract was renewed successively for the academic years 1972–1973, 1973–1974, and 1974–1975. She hoped that if the need for her services as a teacher of sociology continued, she would continue to be reemployed and would eventually be eligible for tenure, but she received a formal reminder each year that each successive contract was for the period specified only.

Following plaintiff's second year of employment, administrative rules then in effect required that she be given one year's notice of a decision not to renew her contract. On February 19, 1975, the then Chairman of the Department (Thomas Ninneman) advised plaintiff that her contract would not be renewed for the academic year 1975–1976. Through her attorney, plaintiff protested the failure to give her adequate notice of nonrenewal. On March 21, 1975, plaintiff was advised by the Chairman and by the Dean of the College of Liberal Studies (Dwight Agnew) that because inadequate notice had been given her, her contract would be renewed for the academic year 1975–1976, and it was so renewed. Thereafter, in the spring of 1975, her contract was further renewed for the first semester of the academic year 1976–1977 (that is, through December 1976). In spring 1975, the Chairman advised plaintiff that she could elect to be considered for tenure in autumn 1975 or at some later

date. Plaintiff chose to seek a tenure determination in autumn 1975. The Chancellor determined that tenure would not be conferred upon her. In December 1975, the Chancellor of UW-Stout informed plaintiff that her contract would not be extended beyond December 1976, and it was not extended beyond that date.

On January 13, 1976, plaintiff's attorney sent a letter to the Chairman requesting an enumeration of reasons for the nonretention. On February 3, 1976, the Vice-Chancellor of UW-Stout (Wesley Face) informed plaintiff's attorney that in cases of nonretention, it was "our university's posture that the appropriate dean is the decisionmaker as identified in sec. UWS 3.07.1(a)." On March 2, 1976, the Dean submitted to plaintiff a statement of reasons:

(1) The Chairman and the sociologists of the Department had identified the hiring of a sociologist-social worker, with the requisite credentials, as a critical programmatic need.

(2) Plaintiff's academic credentials did not warrant continuance of her employment considering that:

(a) the credentials possessed by sociologists and social workers applying for a position with the Department at the time were more in keeping with its needs; and

(b) the Department must maintain flexibility in order to respond to changing student needs, and the ability to recruit and retain key personnel.

On Wednesday, April 14, 1976, plaintiff and her counsel met with the Dean for the purpose of presenting material to persuade him to reconsider his decision. Arguments presented in written form were received by the Dean on April 19, 1976. On April 29, 1976, the Dean advised the plaintiff that his decision with respect to her nonrenewal had not changed as a result of reconsideration. On May 5, 1976, plaintiff requested that the faculty committee on termination of employment review her case. A review of the nonretention decision was conducted on June 7, 1976, by the faculty committee. On September 15, 1976, the committee sent its written decision to the Chancellor. It decided by a vote of 3 to 2 that the appeal of plaintiff was valid. On October 18, 1976, the Chancellor forwarded his review and decision regarding the nonrenewal of plaintiff's contract to plaintiff and the committee, advising that the decision not to renew plaintiff's employment contract remained unchanged.

*The Social Worker Question*

At all times during plaintiff's employment, the Department was made up of five separate disciplines: sociology/social work, history, economics, anthropology and political science. For administrative purposes, however, anthropology and sociology/social work functioned as a single discipline within the Department. Ninneman was a member of the history discipline and became Department Chairman on July 1, 1974, succeeding Willard Bailey, a tenured sociologist who had been Chairman of the Department for some time prior thereto, who was Chairman when the plaintiff was employed in January of 1972, and who continued on after July 1, 1974, as a tenured sociologist.

When Ninneman assumed the position of Chairman, his duties included budget preparation for the Department, supervision of the securing of allocations for positions within the Department, supervision of personnel hiring procedures, supervision of renewal/nonrenewal procedures, supervision of promotions and supervision of tenure proceedings. At UW-Stout the number of positions to be allocated to a particular department was controlled by the Chancellor's office. In addition, as Department Chairman, Ninneman represented the Department in connection with the Department's activities with other units within UW-Stout. He answered to the supervision of the Dean in connection with all of his activities in this regard. In connection with renewal/nonrenewal proceedings and tenure proceedings, recommendations by the disciplines and by the department were advisory to him, and he was charged with making an independent recommendation to the Dean in that regard.

Prior to Ninneman's appointment as Chairman, there had been several meetings with the director of the Child Development and Family Life Program of the School of Home Economics (Schmalzreid) on the general subject of enlarging the social work curriculum within the sociology/social work discipline of the Department of Social Sciences.

In early October 1974, Schmalzreid asked Ninneman to bring the instructors of the introduction to social work course and the child and family agency course to a meeting with her program committee at the end of the month. Ninneman and Schmalzreid met on October 15, 1974. Schmalzreid told Ninneman that she wanted to discuss the contents of the two social work courses and how they were synchronized, and the possibility of a third social work course. Ninneman told Schmalzreid that the sociology of the community course, which was then being taught by plaintiff, seemed to have a peripheral relationship to the subject matter and suggested that Ninneman bring the plaintiff along with him. The meeting occurred on October 29, 1974. Present were Schmalzreid and her program committee; Ninneman; the plaintiff; Willard Bailey; and Arnold Olson, also a tenured member of the sociology/social work discipline. Bailey, Olson and the plaintiff described their course offerings. Schmalzreid sketched the kind of a new course that she would like to see offered by the sociology/social work discipline. She said she thought it should be taught by someone with social work credentials and specifically someone with a master's degree in social work, and that it should be a full-time social work position.

As of October 1974, participants in the Child Development and Family Life Program were required to take four sociology and social work areas: introductory sociology; sociology of the community; introduction to social work; and child and family agencies. Introduction to social work had been developed and was being taught by Olson. Sociology of the community, considered a sociology course, was being taught by plaintiff. Child and family agencies had been developed by a certain sociologist and

was being taught by Bailey. The introduction to social work course and the child and family agency course were the two courses offered by the sociology/social work discipline which were explicitly social work courses, rather than sociology courses, and this remained true as of December 1975.

Olson had a master's degree in guidance and counseling. He had completed all the course work but not the required thesis for a master's degree in social work. He had completed all the course work for a Ph.D. in sociology and for a minor in a Ph.D. program in social work. As of December 1974 through March 1975, Olson did not desire to teach in the social work areas being discussed with Schmalzreid. Ninneman did not discuss Olson's credentials with Schmalzreid, nor did he inform the members of the sociology/social work discipline that he had not discussed Olson's credentials with her.

On December 9, 1974, Ninneman conducted a meeting with the members of the sociology/social work discipline, including Bea Biogony, an anthropologist. Ninneman explained that the Dean wished to talk with him about the proposed acquisition of a person with a master's degree in social work, and that before he talked with the Dean he needed to be sure that the sociology/social work discipline supported the acquisition of a person with a master's degree in social work. Tenured members (Bailey and Kajer) agreed then and there that the acquisition of a person with a master's degree in social work was a first priority. The remaining tenured member Olson then and there acquiesced in the position taken by Bailey and Kajer. Ninneman understood that the acquisition of a person with a master's in social work would be accomplished in one of two ways: (1) the use of a one-quarter position then allocated to the Department and occupied at the time by a John Samuelson, a lecturer in sociology, and whatever allocation could be added to it; or (2) the use of the full-time position then allocated to the Department and occupied at the time by plaintiff. Bailey, Olson and Kajer understood at the time that, depending upon what might occur in the mat-

ter of position allocations to the Department and discipline, the acquisition of a person with a master's degree in social work might prove to be at the expense of a person or persons then employed in the discipline, and specifically the plaintiff. Between December 9, 1974 and March 4, 1975, however, Bailey and Olson were not explicit in their actions or words about this possible consequence to plaintiff. It was plaintiff's and Biogony's impression that there was ambiguity in the December 9, 1974 meeting and that it persisted through March 4, 1975 on the question whether the position allocation then occupied by plaintiff was to be used for the acquisition of a person with a master's degree in social work.

At some unspecified time between July 1974 and December 1974, Ninneman told Samuelson that if Samuelson were to obtain a master's degree in sociology, Samuelson could be appointed to the position then occupied by plaintiff. Samuelson held a bachelor's degree in sociology. Some time during the semester which ended in December 1974, Samuelson told Ninneman that Samuelson had no interest in pursuing studies in social work, and that he had not then decided whether to obtain a master's degree in sociology. At some later time, Samuelson told Ninneman that Samuelson did not intend to obtain a master's degree in sociology. Samuelson's teaching contract was not renewed beyond the 1974–1975 academic year.

In early November 1974 Ninneman discussed with plaintiff whether she would be interested in doing graduate work in social work and getting a master's degree in social work. Plaintiff advised Ninneman that she was not interested.

In January 1975 a last-minute, additional partial position was allocated to the Department for the second semester of 1974–1975 only. Ninneman used it to increase the teaching force in history and economics and not in sociology/social work.

In early February 1975 Ninneman met with the Vice Chancellor and the Dean regarding the Department budget. Ninne-

man proposed a budget in which it was provided that plaintiff was to teach sociology full time and that two social work courses were to be taught by the one-quarter allocation then occupied by Samuelson, plus an additional one-quarter position allocation which Ninneman was then requesting. The Vice-Chancellor informed Ninneman that the plaintiff's full-time allocation was to be considered vacant since she was on a one-year contract only, and her term would expire at the end of the 74–75 term. The Vice-Chancellor also advised Ninneman that when the final budget was prepared, it was likely that the Department would enjoy neither the additional one-quarter position allocation being requested by Ninneman nor the one-quarter position allocation then occupied by Samuelson. The Vice-Chancellor then told Ninneman that if the teaching of social work was the priority, then social work courses would be provided for through the full-time position then occupied by plaintiff.

On February 19, 1975, Ninneman advised plaintiff that the position allocated to the Department which she then occupied on a one-year contract would be utilized to acquire a person with a master's degree in social work. (As set forth above, this notice to plaintiff of nonrenewal for 1975–1976 was rescinded on March 24, 1975 because the notice was untimely under then applicable regulations.) On February 28, 1975, Ninneman was advised that the one-quarter position allocation then occupied by Samuelson had been withdrawn from the Department, and that the request for an additional one-quarter position allocation had been denied. The Department was then left with four full-time position allocations available for the sociology/social work discipline, excluding the full-time position allocation for anthropology then occupied by Biogony, who had taught introductory sociology during the first semester of 1974–1975, who taught no other sociology courses until after December 1976, and who considered herself unqualified to teach sociology.

Biogony was employed in August 1974 for a position described as anthropolo-

gist/sociologist. She was untenured in 1974–1975 and 1975–1976. Prior to the December 19, 1974 meeting, she had been aware of the question whether a person with a master's degree in social work was to be acquired. She was concerned that the full-time position allocation occupied by her might be used for the acquisition of a person with a master's degree in social work. In January and March 1975 Biogony requested that the asserted need for a person with a master's degree in social work be documented to the members of the sociology/social work discipline through the presentation of enrollment data. No such data were offered her in response. However, enrollment data were available to her. She took no initiative to obtain them.

On May 12, 1975, a meeting of the sociology/social work discipline was held to determine whether plaintiff's contract should be extended beyond 1975–1976. Kenneth Kajer, a tenured member of the discipline, moved that plaintiff be retained beyond 1975–1976 only in the event that a new full-time position allocation was obtained for a person with a master's degree in social work. The motion failed 1–2. A motion to recommend an extension for 1976–1977 then passed. Ninneman concurred in the motion to retain plaintiff for the 1976–1977 academic year and so informed the Dean. His concurrence was based upon his confusion regarding the length of the retention term (whether for the first or for both semesters of 1976–1977) and upon his judgment that the length of the term ought to be decided by the Chancellor's office. His concurrence was also based upon the fact that plaintiff had not been given timely notice that her retention or nonretention would be taken up at the May 12, 1975 meeting and upon his view that the proper evaluations had not been conducted prior to the meeting. On May 15, 1975, the Chancellor decided, and advised plaintiff, that her appointment would be renewed through the first semester of 1976–1977, and that by the end of that first semester, plaintiff would be informed of her status thereafter.

From academic year 1971–1972 through academic year 1975–1976 enrollments in the sociology courses both declined and rose (1,944; 1,571; 1,545; 1,761; 1,496) depending upon the number of sections offered.

High enrollments in the introductory sociology course were of continuing concern within the Department. In summer 1975, the Dean provided the Department with an additional part-time position allocation for the express purpose of offering more instruction in the introductory sociology course. From 1971–1972 through 1975–1976, enrollments in social work were 41; 86; 117; 125; 187. During the academic year 1975–1976, the average enrollment in social work was 31.2; the average enrollment in sociology was 55.4; and the average enrollment in plaintiff's courses was 62.9. All but one of the courses plaintiff taught were required courses. When an additional course in social work was offered, two students enrolled.

Between November 1975 and October 1979, seven different people were hired from time to time to teach in the sociology/social work discipline.

### Plaintiff's Credentials

At the time of her hire in 1972, plaintiff possessed a master's degree in sociology. She advised then Chairman Bailey that she intended to pursue her Ph.D. in sociology. She told him that she did not wish to resume her studies immediately because she wanted to spend her time developing her teaching skills; she had a pre-school child at home; and she could not afford to return immediately to school because her husband was a Ph.D. student at that time and they could not finance the two endeavors simultaneously. In 1974, plaintiff had conversations with Ninneman, then Chairman, in which she said she intended to resume her studies and obtain a Ph.D. in sociology.

In summer 1975, plaintiff was admitted to the graduate program at Utah State University and took four courses in sociology at the University of Minnesota, in all of which she achieved the grade of "A." Ninneman was informed in summer 1975 that plaintiff was attending graduate

school at Minnesota. Plaintiff's decision to enter the graduate program at Utah State University was made at about the time of her retention hearing in May 1975. The courses she took at the University of Minnesota in summer 1975 had not been accepted at that time by her Utah State advisor as being applicable to her required course work for the graduate program at Utah State. However, plaintiff chose her courses at Minnesota after consultation with the chairman in her major department at Utah State and after familiarizing herself with the guidelines describing course requirements for the Ph.D. program there. Plaintiff intended those courses to be counted toward the course requirements of her Ph.D. program, and they ultimately were.

Between November 1975 and October 1979, plaintiff had completed all course work for a Ph.D., except for one course which she expected to complete in the first semester of the academic year 1979–1980, and she had completed all Ph.D. examinations and had submitted her dissertation.

### Tenure Density

From 1970–1971 to 1976–1977 only one other department at UW-Stout and the Department of Social Sciences received either equal or increasing allocations in each successive year. Retirement at UW-Stout in 1975–1976 was mandatory at age 70.

### Use of Video-Tape

In November 1975, UW-Stout had guidelines on class size which stated that the use of the media in class was not a key factor in determining class size. Prior to November 1975, a decision had been made that the video tapes would be reviewed to determine whether their continued use would be acceptable. By spring 1976, it was determined that the video tapes were unsatisfactory, and it was recommended that they not be used.

### Plaintiff's Tenure Proceedings

When plaintiff declared her election to be considered for tenure in autumn 1975, a committee of collegial evaluators was formed in October 1975 to evaluate plaintiff's performance. Three collegial evaluations were prepared and submitted. The recommendations of evaluators Snyder and Eggert explicitly recommended the plaintiff for tenure. The recommendation of evaluator Bailey was favorable. These recommendations were submitted prior to November 7, 1975.

On November 7, 1975, Ninneman circulated a memorandum to all department members, advising them that plaintiff could delay her tenure proceedings and it would not be improper for them to ask her to consider delay. On November 10, 1975, plaintiff circulated a responsive memo indicating she was well aware of the options available and it was her desire to proceed. On November 10, 1975, the Chairman again met with plaintiff and advised her to take the option and defer tenure consideration. At that meeting Ninneman told the plaintiff that he knew she would not be tenured if she proceeded on that date. Ninneman also told plaintiff that the tenure decision was an up or out decision, meaning that if tenure was not granted, her employment at UW–Stout would be terminated. This information had been obtained by the Chairman in a conversation with the Vice-Chancellor prior to his circulation of the memorandum of November 7, 1975. Ninneman did not tell plaintiff that he intended to make a negative recommendation regarding her tenure.

On November 10, 1975, a tenure meeting for Ms. Timper was conducted. All of the tenured members of the Social Science Department except one, plus Ninneman, were present. The Chairman did not raise at the meeting, and the Department members did not consider, affirmative action. The members did consider plaintiff's credentials, tenure density, and the question of acquiring a person with a master's degree in social work. At the end of the meeting a vote was taken. Ninneman did not vote. The vote was eight (including the three evaluators) in favor of tenure and three opposed, with one abstention. The tenured members of the sociology/social work discipline voted

2 in favor of tenure and 1 opposed to tenure.

On November 14, 1975, Ninneman prepared a draft of his recommendation to the Dean, opposing tenure for plaintiff. The memorandum stated that the reasons for his recommendation related to plaintiff's credentials, tenure density, and the need for a person with a master's degree in social work. The draft was submitted to all tenured members of the Department and comments were invited. One tenured member, Eggert, sent a memo to the Dean in which he explained why he felt the Dean should concur with the recommendations of the majority of the Department. Another tenured member, Snyder, talked to the Dean personally, giving his reasons why plaintiff should not be terminated. Another tenured member, Magnuson, who had voted in favor of tenure, wrote to Ninneman advising Ninneman that Ninneman had made the right decision for the right reasons.

In all cases, excepting this one, the Chairman made a recommendation consistent with that of the majority of the Department.

Ninneman's original draft recommendation implied that Department members had not fully considered the factors relied upon by him as reasons. One member asked that this statement be removed and it was stricken. On November 18, 1975, the Chairman submitted his negative recommendation and statement of reasons to the Dean. Tenure procedures required that the reasons of the Department members, pro or con, be put in writing. Minutes of the tenure meeting were prepared. Dean Agnew recommended against tenure. The Vice-Chancellor then recommended against tenure, for the same reasons upon which the Dean relied. The Chancellor accepted the recommendation of the Vice-Chancellor.

In every tenure case at UW-Stout to which both were parties, Chancellor Swanson has not done other than concur with the recommendation of Vice-Chancellor Face. In every tenure case at UW-Stout, Vice-Chancellor Face's recommendation was identical to that of the appropriate Dean, and in each case Dean Agnew's recommendation was identical to Chairman Ninneman's.

### Composition of Faculty Generally

At UW-Stout in 1975–76 there were 319 faculty members of whom 239 were male and 80 female. Of the 218 tenured members of the faculty, 174 were male and 44 were female. Thus, 55% of the women were tenured, while 73% of the males were tenured. As of November 1975, 14 members of the Department of Social Sciences were tenured, of whom one was female. All three of the tenured sociologists were male. None possessed a Ph.D.

### Comparative Responses of UW-Stout to Men and Women in Particular Cases

Educational preparation codes are understood in the academic community as being representative of certain steps along the line to obtain a Ph.D. Code 4 represents a master's degree only. Code 3 represents a master's degree plus at least one additional year's course work. Code 2 represents everything for a doctorate except dissertation. Code 1 is an earned doctorate.

Plaintiff's educational preparation code at the time of the tenure decision in her case was a 4. The minimum preparation code number for the rank of instructor was a 4. Plaintiff held the rank of instructor.

In 1973, Kenneth Kajer, a sociologist, had been granted tenure when he also enjoyed a master's degree only. As of that time, persons with Ph.D.'s, and candidates for Ph. D.'s, had applied for positions in sociology at UW-Stout.

In March 1976, Bruce Zito, a member of the economics discipline within the Department of Social Sciences, was granted tenure. His preparation code number was a 2. In February 1978, Robert Evans, a member of the history discipline within the same Department, was granted tenure. His preparation code number was a 3. As of March 1976 and February 1978, applications from persons with Ph.D.'s in the respective disciplines had been received at UW-Stout.

As of October 1979, neither Zito nor Evans had written his Ph.D. dissertation.

As of February 1978, the history discipline consisted of 5¼ position allocations and its course offerings included American, Russian, Latin American and World History. Evans became the fourth of the tenured historians to specialize in American history. In recommending Evans for tenure, Chairman Ninneman refrained from citing the need for persons specializing in history other than American history, but cited Evans' training in light of the programmatic needs of the history discipline. Evans was a specialist in British radicalism, as well as in American history. He had taught a number of inter-disciplinary courses, including Ascent of Man, Current Human Problems, and a Soviet Seminar. He had taught eight of the fifteen history courses offered, and he was prepared to develop new courses in the history of the labor movement. As of February 1978, 1.75 position allocations within the history discipline were untenured. In recommending Evans for tenure, Chairman Ninneman commented that flexibility existed because one historian taught political science as well as history. With respect to the decision on plaintiff's tenure, the Chairman made no mention that Biogony, untenured, had taught sociology for one semester as well as anthropology and she was not counted by him as a member of the sociology/social work discipline. The problem of tenure density was minimized in the decision on tenure for Evans because one of the tenured members of the history discipline would be 60 years old on the effective date of Evan's tenure and the other tenured members would be in their 50's.

### Conduct of Chairman Ninneman Allegedly Reflecting Attitudes Toward Females in General and Plaintiff in Particular

In fall 1974, Ninneman had advised the sociology/social work discipline members that meetings would be held to determine whether nontenured members of the discipline should be retained for an additional year, and that these meetings would be preceded by collegial evaluations of those nontenured members. No such meetings were held nor collegial evaluations made prior to February 19, 1975, when Ninneman advised plaintiff that her contract would not be renewed for 1975–1976. Prior to February 19, 1975, however, the Vice-Chancellor had informed Ninneman that because plaintiff's employment would be terminated at the end of the 1974–1975 year, no retention hearing was required and none should be given.

When plaintiff's husband informed Ninneman that plaintiff was in Minnesota engaged in graduate studies in summer 1975, Ninneman said that it was nice that plaintiff's husband was allowing plaintiff to do so.

In November 1975, Ninneman was aware that UW-Stout had affirmative action requirements relating to equal employment opportunity. He did not cite them in the course of the proceedings on tenure for the plaintiff. Subsequently to the time plaintiff filed her charges of discrimination, Ninneman made frequent references to affirmative action in connection with the hiring of personnel.

In March 1975, Ninneman told plaintiff that her fight to keep her job after he had attempted to abolish it had proved to him that she wanted to work.

He referred to plaintiff as a peach.

Ninneman's recommendations in the plaintiff's tenure case included a comment that plaintiff was pleasant and cooperative and no such references were made by him in the cases of Evans and Zito.

Although plaintiff had informed him of her intention to pursue her graduate studies, Ninneman told Biogony that it surprised him when she did so.

Ninneman stated that his wife did not work and that he did not want her to work.

Ninneman commented that another member of the Department was having marital problems, and Ninneman attributed those problems to the fact that the member's wife worked.

Ninneman scheduled a meeting on a subject in which Biogony had repeatedly expressed concern, chose a time on March 4, 1975 at which she taught a class, and gave her no notice of the meeting.

When Biogony suggested that the discipline members meet for a discussion of their prospective course offerings, Ninneman accused her of trying to take over the chairmanship.

When Olson and Biogony attempted to have plaintiff substitute for them at times after December 1976, Ninneman refused, telling Olson that because plaintiff had an action pending against the university, she could not act as a substitute teacher.

After December 1976, plaintiff applied for several positions in sociology at UW-Stout. She was not hired. Some of the positions for which she applied were explicitly for teaching courses she had previously taught successfully.

## OPINION AND ORDER

Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. She has satisfied the procedural prerequisites by filing an administrative complaint and receiving a right to sue letter. 42 U.S.C. § 2000e-5.[1] Jurisdiction is present. 42 U.S.C. § 2000e-5(f)(3). Plaintiff contends that she was denied tenure because of her sex and, therefore, that the denial was an unlawful employment practice, within the meaning of 42 U.S.C. § 2000e-2(a)(1).

On August 29, 1980, I entered findings of fact, pursuant to Rule 52(a), Federal Rules of Civil Procedure, following a trial to the court. I reaffirm those findings. More recently, I have discussed with counsel whether additional findings are possible concerning the fate of the job plaintiff had held, following the denial of tenure to her. No transcript of the trial has been prepared. The court reporter has provided whatever assistance she could by reference to her notes. Pursuant to Rule 52(a), I find as

fact, as of the time of trial, those matters set forth hereinafter under the heading "Additional Facts."

## Additional Facts

The number of instructional staff positions allotted to the Department of Social Sciences (Department) in the academic year 1975–76 was 19.07 and 19.35 in 1976–77. (Ex. 46) In 1975–76 and Semester I of 1976–77, the sociology discipline consisted of four full-time teachers—Bailey, Olson, Kajer, and plaintiff—and a one-quarter-time position filled by Joel Breitung. Breitung had a master's degree in social work. (Ex. 29)

In September, 1976, Ninneman circulated a memorandum to Bailey, Olson, Kajer, plaintiff, and Biogony, saying the Department had been authorized to recruit a social worker for the second semester. Attached to the memorandum was a notice of an opening in "Social Work-Sociology" for Semester II, 1976–77 which Ninneman proposed to circulate. A master's degree in social work was to be required for this academic staff position, with graduate work in sociology mentioned as "desirable." (Ex. 61)

During the second semester of the 1976–77 academic year, when plaintiff was no longer employed by University of Wisconsin-Stout, sociology courses were taught by Bailey, Olson, Kajer, and a woman named J. Fran Webb, who held a master's degree in social work. (Exs. 73 and 77; Ninneman's testimony) Webb taught the one course previously taught by Breitung, two sections of Introduction to Social Work (Ex. 73 and 83) previously taught by Olson, and one new course on casework (Ex. 70) in which two students enrolled. During the academic year 1977–78, she also taught Sociology of the Community (Exs. 73 and 83) which had previously been taught by plaintiff.

Kajer went on leave during the first semester of 1977–78. The notice of this tem-

---

1. Plaintiff filed charges of employment discrimination with the Equal Rights Division of the Wisconsin Department of Industry, Labor, and Human Relations. Her complaint was deferred to the Equal Employment Opportunity Commission which issued the right to sue letter.

porary opening stated that the minimum credentials required were a master's degree in sociology. (Ex. 50) In addition to this opening, the Department advertised for a person with a master's degree in sociology to teach one section of Introduction to Sociology for Semester I of 1977–78 on a part-time basis, with the possibility of renewal for Semester II. (Ex. 50) Plaintiff applied for the temporary full-time position as well as the part-time position. (Exs. 51, 52, and 53) A man named Han Gu Kim was hired to assume Kajer's course offerings while he was on leave. (Ex. 73) Kim had a Ph.D. in social-cultural anthropology as well as a master's degree in anthropology with a sociology minor. After Kajer returned, Kim continued teaching two sections of Introduction to Sociology as well as a course which had been taught at one time by plaintiff. (Ex. 73)

At the same time that the Department advertised the two openings mentioned in the preceding paragraph, it publicized an opening in "Social Work-Sociology" for the 1978–79 academic year. The notice stated that applicants must have a master's degree in social work as well as graduate work in sociology. (Ex. 50) Plaintiff applied for this position (Ex. 48) but was informed by Ninneman that the sociologists had voted to recruit a "social worker/sociologist." (Ex. 49)

During plaintiff's employment with University of Wisconsin-Stout, Introduction to Sociology was taught by plaintiff, Bailey, Kajer, Olson, Samuelson, and Biogony, among others. Plaintiff also taught Sex Roles, Minority Groups, and Sociology of the Community. During the period beginning with Semester II of 1976–77 and ending with Semester II of 1977–78, the introductory course was taught by Bailey, Kajer, Olson, Kim, and Hamm, who was a member of the political science discipline; Biogony taught Sex Roles; Bailey and Kim taught Minority Groups; and Webb offered Sociology of the Community.

In addition to the original findings, and additional findings set forth above, I find that as of November, 1975, one of the goals of the university's affirmative action plan was the hiring of two more women with either master's degrees or doctorates for the Department of Social Sciences. This goal was to be met "as soon as possible" and within a maximum of three years. (Ex. 45)

### Opinion

In *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Texas Dept. of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), among other decisions, the Supreme Court of the United States has undertaken to provide rather detailed directions to trial courts charged with the duty to decide a Title VII case. Most famous among these directions is that found in *McDonnell-Douglas*, a case involving alleged racial discrimination in hiring, in which it was held, 411 U.S. at 802, 93 S.Ct. at 1824, that a prima facie case may be established by a plaintiff's showing:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

In a footnote to the passage just quoted (411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13), the Court observed that the formula is not necessarily applicable in every respect in every factual context.

The factual context of a tenure decision in a university is surely among those in which the *McDonnell-Douglas* formula cannot be applied literally and in every respect. The legal significance of a university tenure decision in a Title VII case is ambiguous. This ambiguity is underscored by the failure of the complaint here to make explicit whether the unfair employment practice complained of is discriminatory hiring, discriminatory discharge, or discrimination

with respect to terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1).

There is no doubt that the issue is whether the tenure decision, and not some other decision, was made adversely to plaintiff "because of [her] sex." *Id.* Nor is there any doubt that it was because of the tenure decision that after December, 1976, plaintiff was no longer employed by the defendant. The so-called "up or out" system was in force well before plaintiff appeared on the scene. As plaintiff was aware, when she elected to be considered for tenure in November, 1975, denial of tenure meant denial of renewal of her existing contract. For Title VII purposes, the ambiguity resides in whether the adverse tenure decision is to be viewed as a decision to "discharge" or a decision "to ... refuse to hire ...." *Id.* As of November, 1975, plaintiff's employment contract as an untenured teacher was to expire by its terms in December, 1976. She enjoyed an expectancy that that contract might be renewed for some period of time yet to be specified, but not "permanently," after December, 1976.[2] Thus, the adverse decision may be viewed as a decision to terminate her employment, to "discharge" her. On the other hand, as of November, 1975, it was within the power of the defendant to appoint her to a teaching position in which she would have been secure "permanently." Thus, the adverse decision on tenure may be viewed as a decision "to ... refuse to hire ...."

In my view, it is unnecessary to resolve this ambiguity or, perhaps better said, it is sufficient to treat the tenure decision as both a discharge and a hiring decision. Literally to apply the *McDonnell-Douglas* formula to a prima facie case challenging the denial of tenure would require a decision whether "qualified for a job" means "qualified for the non-tenured teaching job," held by plaintiff at the time tenure was denied, or "qualified for the tenured teaching job"

being sought. Also, it would require a decision whether the "position" which "remained open" and for which "the employer continued to seek applicants from persons of complainant's qualifications" is the non-tenured job held by plaintiff at the time tenure was denied or the tenured job being sought.

Whether a prima facie case is adequate turns upon whether it "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (cited with approval in *Texas Dept. of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094). The practical significance of success in making a prima facie case is that it raises a presumption of discrimination which requires defendant to produce evidence sufficient to raise "... a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." (footnotes omitted). *Id.*

In the present case, I hold that plaintiff's evidence constituted a prima facie case that the denial of tenure was because of her sex, within the meaning of the statute. She proved that she is a woman, that it was within the power of the defendant to grant her tenure, and that she was denied tenure. Sufficiently to raise an inference of unlawful discrimination, she proved by a preponderance of the evidence: (1) that she was qualified for the nontenured job which she held as of November, 1975, and for a renewal of a contract for that job after December, 1976; (2) that she was qualified for appointment to the tenured position she sought;[3] and (3) that the

---

2. Because this is a statutory case and not a constitutional case, it is unnecessary to inquire how strong or fragile this expectancy may have been and thus to determine whether it constituted "property," within the meaning of the due process clause of the Fourteenth Amendment. See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

3. Evidence of the eight to three vote by the tenured members of the Social Sciences Department, recommending tenure, was sufficient for the purpose of a prima facie case.

"position remained open" in the sense that the Department enjoyed in 1976–1977 a number of instructional staff positions slightly greater than the number for 1975–1976.

I hold that the defendant then met its burden to "articulate," by the presentation of evidence, "some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell-Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. *See Texas Dept. of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094. Defendant's evidence was sufficient to raise a genuine issue of fact whether each of the following reasons was the reason for denial of tenure: (1) Ninneman and the sociologists within the Department had identified the hiring of a sociologist/social worker, with the requisite credentials, as a critical programmatic need. (2) The credentials of other sociologists as well as social workers applying for a position with the Department at the time were more in keeping with its needs. (3) Granting plaintiff tenure would have meant that all of the sociologists and 15 of the 19 members of the Department would be tenured, leaving it little flexibility to recruit personnel in the future to respond to changing student needs.

This successful articulation of reasons by the defendant means that the factual inquiry must proceed (*id.*):

"... to a new level of specificity .... "The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence...."

4. Women's Equity Action League (WEAL), Educational and Legal Defense Fund, *Women Graduates* (Aug.1975) (Exs. 78 and 79)

In the present case, plaintiff has undertaken to meet this ultimate burden of persuasion in both ways: (1) directly by showing that a discriminatory reason more likely motivated the employer, and (2) indirectly by showing that each of the articulated reasons is unworthy of credence. Although the plaintiff's contentions cannot be compartmentalized perfectly as "direct" or "indirect," I group them for discussion as follows: Among the attempted direct proofs are: (a) evidence of the institutional record of University of Wisconsin-Stout on employment and promotion of female teachers; (b) evidence of Ninneman's attitudes toward women; (c) evidence that males had been dealt with more favorably on the subject of tenure than was plaintiff. The attempted indirect proofs, on the other hand, are intended to demonstrate the invalidity of each of the reasons articulated by the defendant.

### Attempted Direct Proofs

■ (a) Evidence of the employer's general policy and practice regarding the employment of women may be relevant to whether discrimination occurred in the particular case at hand. *McDonnell-Douglas Corp. v. Green, supra* 411 U.S. at 804–05, 93 S.Ct. at 1825. Plaintiff has shown that in 1975–1976 nearly 75% of the University of Wisconsin-Stout faculty was male. In addition, 73% of those male faculty members had tenure while 55% of the females had tenure. These statistics are not reflected within the Department. As of November, 1975, one of the fourteen tenured members of the Department was female. All three of the tenured sociologists were male.

Plaintiff has submitted statistics[4] which indicate that, nationally, women earned 17.07% of the doctor's degrees awarded in sociology between 1960 and 1969 and 20.58% of those degrees awarded from 1969 to 1972. In the social sciences generally, women earned 11.1% of the total doctorates earned from 1960 to 1969 and 13.81% of

those earned from 1969 to 1972. In addition, a "Guide to Availability of Unclassified Personnel Appropriate for UW Stout" was prepared in November, 1975, by UW-Stout in formulating its affirmative action plan. (Ex. 45) This guide states that, as of some time period which cannot be discerned from exhibit 45, 28% of the graduates with a master's degree in sociology and 16% of the graduates with a sociology doctorate were women. The authenticity of the statistics contained in exhibits 45, 78, and 79 has not been established in the record in this case and I have refrained from finding them as fact. However, I will assume for the moment that they are accurate. Although these reports indicate that more qualified women were "available" to teach than were hired by the Department, neither indicates how many of those qualified women actually applied and were rejected. Nor does either report address the question of tenure for persons previously hired. Finally, an institution cannot harbor an intention. Persons within an institution can. When, over a period of time, one specific person or a combination of specific persons have controlled institutional policy on some matter, the intention of that person or those persons may well be reflected in the objective performance of the institution. But there is no evidence that Ninneman controlled, or shared significantly in controlling, hiring or promotion at the university during the years of decision-making reflected in the November, 1975, distribution of jobs and tenure among males and females. He had not become even a department chairman until July, 1974. As plaintiff contends and I agree, Ninneman was the maker of the effective decision on plaintiff's tenure. It is the presence or absence of a discriminatory intention on his part which controls the outcome of this lawsuit.

(b) With respect to Ninneman's attitudes toward women in the teaching profession at the university level, I find it unpersuasive evidence of sexual bias that he failed to follow certain procedures before advising plaintiff in February, 1975, that her contract would not be renewed for 1975–76; or that he called plaintiff a peach; or that he commented that she was pleasant and cooperative, although he had made no such comment about two males, Evans and Zito; or that he failed to give Biogony notice of a certain meeting; or that he accused Biogony of trying to take over the chairmanship; or that after December, 1976, plaintiff was denied employment as a teacher from time to time as a substitute or otherwise. On the other hand, I consider it probative of an anti-feminist bias, in some degree, that he told plaintiff's husband that it was nice of the husband to allow plaintiff to attend summer school away from home in 1975; that, despite the affirmative action goal enunciated in November, 1975, that two more women be hired in his Department within three years, he did not acknowledge the importance of this goal either during the faculty deliberations or when he engaged in recommending denial of tenure to plaintiff; that he told plaintiff that her fight to keep her job had proved to him that she wanted to work; that he said he was surprised when plaintiff informed him of her intention to pursue her graduate studies; that he said he did not want his wife to work; and that he attributed the marital troubles of a faculty couple to the fact that the wife worked.

(c) Plaintiff's showing that Ninneman engaged in disparate tenure treatment of males and females is unpersuasive. It is limited to the cases of Kajer, Zito, and Evans. When the comparison is to so few cases, even relatively minor distinctions between plaintiff's case and the others dissipate the force of a claim of sex discrimination, even though it could be shown that the decision in one case or another was erroneous or unwise. There are definite and obvious distinctions between the Zito case and the Evans case, on the one hand, and plaintiff's on the other. Tenure was granted Kajer before Ninneman became chairman of the Department. In any event, a different result in one case involving a male and one case involving a female is of virtually no probative value on the issue of discriminatory intent.

### Attempted Indirect Proofs

(a) One of the three legitimate, nondiscriminatory reasons articulated by the de-

fendant is that the credentials of other sociologists as well as social workers applying for a position in the Department as of November, 1975, were more in keeping with the Department's needs than those of the plaintiff. To the extent that this reason overlaps the asserted need to hire a sociologist/social worker with the requisite credentials (and I have assumed that it does overlap), I will address it below. The eight to three vote among tenured members of the Department in favor of tenure for plaintiff was an implicit rejection of the proposition that what was called for, forthwith, was a person with social work credentials. While significant, this policy judgment is qualitatively different from the vote's implicit rejection of the proposition that plaintiff should be rejected in favor of someone with more impressive academic credentials in sociology. For a departmental chairman to override the tenured members in assigning priorities among programmatic needs is one thing, but a chairman would be far less disposed to override their assessment of plaintiff's academic credentials and potential in her own field as compared with those of other persons.

(b) A second articulated reason is that granting plaintiff tenure would have meant that all of the sociologists and 15 of the 19 members of the Department would be tenured, leaving it little flexibility to recruit personnel in the future to respond to changing student needs. Tenure density was clearly a problem. However, as of November, 1975, plaintiff was one of four probationary teachers within the Department (two males and two females); about four months after denial of tenure to plaintiff, tenure was granted to one of the males; about two years thereafter, tenure was granted to the other male and the female. Also, in the case of historian Evans, the tenure grant left less than a single position untenured within his discipline. These facts dissipate significantly the vitality of defendant's tenure-density explanation for denial of tenure to plaintiff.

(c) The third and major reason articulated by the defendant is that Ninneman and the sociologists within the Department had identified the hiring of a sociologist/social worker, with the requisite credentials, as a critical programmatic need.

Plaintiff asserts that, in reality, there was no such programmatic need. I am unwilling to address this issue. *See Lieberman v. Gant*, 474 F.Supp. 848, 865 (D.Conn. 1979), *aff'd*, 630 F.2d 60 (2d Cir. 1980). Rather, the threshold question is whether Ninneman reasonably perceived that such a programmatic need existed and that the need was critical. I conclude that plaintiff has failed to meet her burden to prove by a preponderance of the evidence that Ninneman did not entertain this perception or that it was an unreasonable perception.

For brevity, I will describe as "the social worker proposal," the proposal that certain additional courses in social work be offered and that a person with academic credentials in social work (and possibly experience as a social worker) be hired to teach some or all of these and other existing social work courses. The social work proposal had been the subject of several meetings between Schmalzreid and the chairman of the Department of Social Sciences before Ninneman became chairman on July 1, 1974. In October, 1974, Schmalzreid resumed the initiative. The sociologists, including plaintiff, met with Ninneman and Schmalzreid on October 29, 1974, to discuss it. On December 9, 1974, in the presence of plaintiff, tenured sociologists Bailey and Kajer agreed that the social worker proposal was a first priority and the third, Olson, acquiesced. This decision was reached with the understanding on the part of all three, as well as Ninneman, that the social worker proposal might prove to be at plaintiff's expense, depending on whether an additional job allocation could be obtained for the Department. In early February, 1975, Ninneman discussed the social worker proposal with the Vice-Chancellor. The discussion dealt directly with using for the social worker the position allocation then occupied by plaintiff. On February 19, 1975, Ninneman acted. He informed plaintiff that she would not be employed after the 1974–1975 academic year and that the vacancy would be filled by a social worker.

As of February 19, 1975, therefore, Ninneman had strong reason to believe that the social worker proposal was a response to a critical programmatic need. Plaintiff contends that by November 18, 1975, Ninneman had been disabused of that perception by several events, principally: (i) the May 12, 1975, meeting of the sociology/social work discipline at which Bailey and Olson outvoted Kajer on the latter's motion that plaintiff be retained beyond 1975–76 only in the event that a new full-time position allocation was obtained for a social worker; and (ii) by the November 10, 1975, meeting of the tenured members of the Department, at which eight (including Bailey and Olson) voted to grant tenure to plaintiff and three voted not to grant it. I agree that Ninneman knew clearly by November 18, 1975, that Bailey, Olson, and six other tenured members of the Department had formed the opinion that plaintiff should not be denied tenure in order to make possible the hiring of a social worker. But I do not agree that plaintiff has shown by a preponderance of the evidence that Ninneman had become persuaded that the need for the social worker was not sufficiently critical, on its merits, to compel the denial of tenure to plaintiff.

It is possible that plaintiff might have met this burden had she been able to sustain her thesis that, after December, 1976, the position she had occupied was filled by Kim, who was not a social worker. The additional findings I have included in this opinion and order exhaust the findings on this subject permitted by the present record. It is sufficient to say that they do not support the inference urged by plaintiff. Although they fall short of supporting, by a preponderance of the evidence, a finding that plaintiff's position was filled by a specific person or persons, the most reasonable inference is that the person was Webb.

### Conclusion

I consider it unfortunate that the word "pretext" has acquired such potency in Title VII cases. It is as if, once defendant has been called upon to articulate a legitimate nondiscriminatory reason for its decision and has done so, the plaintiff will win if she exposes that reason as a "pretext" and she will lose if she fails. The statute forbids a failure or refusal to hire, or a discharge, of an individual "because of such individual's ... sex ...." This plaintiff must prove that had all else been the same, but had she been a man, she would not have been denied tenure. Ninneman entertained throughout a reasonable perception that the need for a social worker was so critical as to justify denial of tenure to plaintiff in order to create the required vacancy. But the question is, had plaintiff been a man, would Ninneman have been so resolute in responding to this programmatic need by denying a secure job to a man then nearing the end of his fourth calendar year as a teacher in the university? I have my doubts. My judicial task is to inquire whether plaintiff has shown by a preponderance of the evidence that Ninneman would have faltered in the showdown, had she been a man. My decision is that she has failed to meet this burden.

### Order

It is ordered that judgment be entered dismissing this action on its merits.